**Ronald Roy HENDERSON,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

No. 83–5749.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1985.

Decided March 11, 1986.

As Amended May 27, 1986.

Steven D. Nelson, San Diego, Cal., for plaintiff-appellant.

Warren P. Reese, Asst. U.S. Atty., San Diego, Cal., for defendant-appellee.

Before NELSON, CANBY, and BRUNETTI, Circuit Judges.

NELSON, Circuit Judge:

Ronald Roy Henderson suffered severe injury as a result of contact with high voltage wires while trespassing on federal land. The district court entered judgment for the United States, dismissing Henderson's claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) (1982). We reverse and remand.

## I.  FACTUAL BACKGROUND

On July 17, 1977, Jeffrey Harmon, then age 26, and Henderson, age 20, entered a remote section of Miramar Naval Air Station, formerly used as a missile test facility, to remove copper cable attached to a power pole.[1] Henderson and Harmon entered the facility by car through a breach in the fence. Although "Government Property No Trespassing" signs marked the area, access was not difficult, and trespassing was commonplace. Vandalism, salvaging, firearm shooting, motorcycle riding, and beer drinking occurred with regularity at the missile test site area. Henderson and Harmon themselves had previously entered the facility.

Harmon and Henderson drove to a power pole near a water tank approximately 1000 feet from the missile test site area. After assuring Henderson that the power lines were dead, Harmon climbed the thirty-three foot power pole with the assistance of climbing gaffs (spiked shoes) and a safety belt. As Harmon attempted to cut the copper cable, he touched an exposed live wire. Henderson saw a flash and saw Harmon's body lurch backwards.

Henderson climbed the power pole in an attempt to return Harmon to the ground. Henderson grabbed a live wire, received a shock, and was thrown from the pole. Injuries from the fall left Henderson permanently paralyzed.

## II.  FORESEEABILITY

■ The United States, as the owner and operator of the naval base and missile test facility, is liable for claims brought under the FTCA to the extent a private party would be liable under similar circumstances.[2] 28 U.S.C. § 1346(b) (1982). Here, the alleged wrongdoing took place in California. We look to California law to determine the rights, duties and liabilities involved in the maintenance of high voltage power lines. *See Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir.1985) (law of the state where the act or omission occurred determines whether actionable duty exists under the FTCA).

Under California law, as a general rule, a "defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." *Tarasoff v. Board of Regents*, 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976) (*quoting Rodriguez v. Bethlehem Steel Corp.*, 12 Cal.3d 382, 399, 115 Cal.Rptr. 765, 776, 525 P.2d 669, 680 (1974) ). The district court found that the accident resulting in Henderson's injury was not foreseeable. We review the district court's factual determinations under the clearly erroneous standard. *See United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46

---

1. It is unclear whether Henderson was just along for the ride or intended to participate in the theft.

2. We reject the government's argument that the "discretionary function exception" to FTCA liability, 28 U.S.C. § 2680(a), precludes liability. The exception applies only to decisions made at the planning stage. Here, the missile facility safety decisions were operational in nature, and, therefore, the exception is inapplicable. *See McGarry v. United States*, 549 F.2d 587, 591 (9th Cir.1976), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977).

(1984). We review the legal determinations *de novo. Id.* at 1201.

The district court's conclusion that the accident was not foreseeable was based on three factors. First, the court found that while members of the public entered the facility to "sight-see, picnic, drink beer, have parties, spray paint graffiti, commit vandalism and take copper wiring and other material," those activities took place at the missile test site, not at the nearby water tank area.[3] Second, the court found no evidence of tampering with the power poles before the accident; such evidence might have placed government employees on notice of possible danger. Third, the court determined that the government could not be expected to foresee the actions of Harmon or Henderson or of "people in the same status," apparently referring to their presence on government land as trespassers and thieves.

California law imposes a duty on a property owner, as we view the government in this FTCA case, to act as "a reasonable man in view of the probability of injuries to others," without giving determinative weight to the status of the injured party. *Rowland v. Christian*, 69 Cal.2d 108, 119, 70 Cal.Rptr. 97, 104, 443 P.2d 561, 568 (1968) (en banc). "Where the occupier of land is aware of a concealed condition involving in the absence of precautions an unreasonable risk of harm to those coming in contact with it ... the trier of fact can reasonably conclude that a failure to warn [of] or to repair the condition constitutes negligence." *Mark v. Pacific Gas & Electric*, 7 Cal.3d 170, 177, 101 Cal.Rptr. 908, 912, 496 P.2d 1276, 1280 (1972) (*quoting Rowland*, 69 Cal.2d at 119, 70 Cal.Rptr. at 104, 443 P.2d at 568).

Here, the clear weight of the evidence shows that the danger posed by the high voltage wires at an unused facility, when combined with indications of potential public contact with the hazard, gave rise to foreseeable harm. It is undisputed that trespassing, theft of property, and other activities were uncontrolled and extensive within the missile test facility as a whole. The public had virtually uninhibited access to the area through often-breached fences ornamented with bullet-riddled "no trespassing" signs.

We believe that the district court's distinction between two areas of the missile test facility, the missile test site and the water tank area, is artificial and not supported by the evidence. No physical barrier, such as a fence, separates the test site from the water tank area. The water tank area is part of the facility and the subject of at least some public curiosity. In fact, Harmon and his family drove through the facility, including the water tank area, one month before the accident. Given the rampant trespassing at the missile test site, a reasonable landowner would have been placed on notice that the water tank area, 1000 feet away and accessible by road, was also subject to unauthorized visitation.[4] The district court's finding to the contrary is clearly erroneous.

Next, the district court's conclusion that no instance of tampering with power poles had occurred to put government employees on notice, contradicts its conclusion that Harmon himself had stolen conductor wire from another power pole fifteen days before the accident. Thus, Harmon's theft and the existence of dangling wires must have gone unnoticed during at least fifteen area security inspections for the government to have been unaware of tampering. Government employees, who inspected the area between one and four times daily, reasonably *should* have been aware of Harmon's tampering.

---

**3.** The water tank stands about 1000 feet from the test site as the crow flies and about ½ to ¾ mile by way of the road which winds its way between the two areas.

**4.** The lack of extensive litter at the water tank area, though such litter was prevalent at the test site, does not undermine the conclusion. The flatter test site area was the more obvious picnic and drinking spot.

Third, we interpret the district court's reference to Harmon's and Henderson's "status" to comply with California law—that is, as having some bearing on the question of liability, but not as a determinative factor. *See Rowland,* 69 Cal.2d at 119, 70 Cal.Rptr. at 104, 443 P.2d at 568. However, because almost all the foreseeable victims were trespassers and at least some of them were thieves. Harmon's and Henderson's status has no bearing on the issue of foreseeability.

Additional factors also persuade us of the foreseeability of the potential harm. First, the presence of high voltage wires constituted a high risk of harm, reasonably requiring heightened caution. *See Mark,* 7 Cal.3d at 178, 101 Cal.Rptr. at 913, 496 P.2d at 1281. Second, a Navy electrician testified as to the navy's policy of deenergizing out-of-use power lines for reasons of safety. The final remaining use for the power lines at the facility—a communications radio—had been removed almost a month before the accident. The Navy's policy indicates an awareness of potential hazards. Third, before the accident, another Navy electrician recommended deenergizing the power lines, again evidencing the government's awareness of the danger.

■ In sum, we believe that the potential danger of the 12,000 volt power lines at an unused facility, combined with evidence of easy access, extensive vandalism, and damage to other power lines at least fifteen days before the accident creates a foreseeable risk of injury.

## III. DUTY

The foreseeability of risk gives rise to a duty to reduce or warn of that risk. *See*

*Molsbergen,* 757 F.2d at 1021; *Tarasoff,* 17 Cal.3d at 434, 131 Cal.Rptr. at 22, 551 P.2d at 342. The district court did not find the accident foreseeable and therefore did not determine the extent of the government's duty under California common law. It also concluded that the government was not presumed negligent under Cal.Evid.Code § 669(a)[5], because it determined that California Public Utility Commission General Order No. 95 (GO 95), setting forth safety standards for the design and construction of high voltage power lines, did not apply to the United States in this case. Because the applicability of GO 95 to the United States raises a legal issue, we address that issue first.

### A. Presumed Negligence.

■ Under the statutory provision for presumed negligence, any applicable statute, ordinance, or regulation defines the extent of the defendant's duty. *See* Cal. Evid.Code § 669. The district court held GO 95 inapplicable in this case because the United States did not function as a public utility in maintaining the power lines at the missile facility. We find that GO 95, however, applies to non-public utility power line owners.

The California Railroad Commission[6] enacted GO 95 pursuant to the California code sections currently codified as Calif. Pub.Util.Code §§ 8001-57. *See In the Matter of Reasonableness of Rules for Overhead Electric Line Construction,* 43 Cal. RR Comm'n 872, 873 n. 1 (1941). The provisions of sections 8001-57 apply to all "persons," which section 8002 defines as

---

**5.** Cal.Evid.Code § 669(a) provides:
The failure of a person to exercise due care is presumed if:
(1) He violated a statute, ordinance, or regulation of a public entity;
(2) The violation proximately caused death or injury to person or property;
(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and
(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

**6.** The California Railroad Commission was the predecessor of the California Public Utilities Commission.

including: "any commission, officer, agent, or employee of this State, or of any county, city, city and county, or other political subdivision thereof, and any other person, firm, or corporation." In addition to this plain language in section 8002, the legislative history of the relevant provisions supports broad application.

The United States argues that the Public Utilities Act, Cal.Pub.Util.Code §§ 201–2115, and the entire Public Utilities Code, including sections 8001–57, do not apply to entities, such as the government here, who were supplying power solely for their own use. The original version of the Public Utilities Act, which was enacted separately from sections 8001–57, empowered the Railroad Commission to regulate public utilities. 1911 (extra session) Cal.Stat. 18, ch. 14. The predecessor to sections 8001–57, though promulgated in the same year, was not limited to regulation of public utilities. Its subtitle described it as "[a]n act regulating the placing, erection, use and maintenance of electrical poles, wires, [and] cable ...," without mention of public utilities. 1911 Cal.Stat. c. 499, p. 1037, 1. From 1911 to 1915, these statutes were subject to enforcement only through the normal criminal processes. In 1915, the legislature passed what is now section 8037, giving the Commission the duty of enforcing sections 8001–36, and authorizing it to "make such further additions or changes as the commission deems necessary for the purpose of safety to employees and the general public." The Commission exercised this power in promulgating G.O. 95 and its predecessors. When the legislature recodified both provisions under the "Public Utilities Code," it noted that the Code "consolidat[ed] and revis[ed] the law relating to and regulating public utilities *and other regulated businesses and matters incidental thereto...*" 1951 Cal.Stat. 2025, c. 764 (emphasis added).

Under the California Constitution, Article VII §§ 3 & 5, the legislature is empowered to confer any necessary authority upon the Public Utilities Commission (PUC) to define broadly the persons affected by its regulations. The legislature conferred such authority in enacting § 8037.

The PUC has interpreted its own order, GO 95, to apply to private persons. *In re Los Angeles Metropolitan Transit Authority,* 60 Calif. PUC 125, 133 (1962). Further, sections 8001–57 and GO 95 are designed for the safety of workmen and the general public.[7] *Id.* (the "legislative policy of uniform statewide regulation of such safety matters has been clearly recognized...."); *In the Matter of Reasonableness of Rules,* 43 Calif. RR Comm'n at 874 ("the rules [now GO 95] ... provide a standard of safety both to the workman and the public ...."). Its function as a safety regulation distinguishes GO 95 from the narrower utility-regulating functions of sections 201–2115. We find nothing in the statutory history to suggest that power lines operated for private use are less worthy of safety regulations protecting the public than regulations than those operated for public use, because the danger posed is not defined by the public or private nature of the use. The safety regulations of GO 95 apply to the United States in this case.

For the presumed negligence analysis, therefore, GO 95 defines the duty of the United States as the operator of power lines. We remand to the district court to determine exactly what GO 95 requires in these circumstances and whether the United States violated GO 95. We note that if GO 95 were violated, at least three of the four requirements of presumed negligence under Cal.Evid.Code § 669 are present: (1) a violation has occurred; (2) the statute is designed to prevent the injury; and (3) Henderson was in the protected class. The district court must then make a finding on the fourth prong: whether the violation proximately caused Henderson's injuries. If so, negligence is presumed, though the

---

**7.** GO 95 is designed, in part, to minimize the possibility of electrocution.

United States may seek to rebut the presumption. *See* Cal.Evid.Code § 669(b).[8]

### B. *Common law negligence.*

As the district court recognized, it should also consider whether the United States had a common law duty of reasonable care other than that defined by the requirements of GO 95. *See Silveira v. Imperial Irrigation District,* 85 Cal.App.3d 705, 708, 149 Cal.Rptr. 653, 655 (1978). While we express no opinion on the subject, we note that the record indicates that the electrical current could have been shut off if someone had made a brief phone call. The district court should decide whether the United States failed to meet its common law duty of care, and if so, whether that failure proximately caused Henderson's injuries.

### CONCLUSION

Henderson's accident was foreseeable. We remand for the district court to consider whether the government is liable because in light of that foreseeability, it failed to meet its legal duty of care, and that failure was the proximate cause of Henderson's injuries.

REVERSED and REMANDED.

---

**8.** Cal.Evid.Code § 669(b) provides:
This presumption [of failure to exercise due care] may be rebutted by proof that:
(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; or
(2) The person violating the statute, ordinance, or regulation was a child and exercised the degree of care ordinarily exercised by persons of his maturity, intelligence, and capacity under similar circumstances, but the presumption may not be rebutted by such proof if the violation occurred in the course of an activity normally engaged in only by adults and requiring adult qualifications.