**Irene H. ALLEN, et al.,**
**Plaintiffs-Appellees,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 84–2126.**

United States Court of Appeals,
Tenth Circuit.

April 20, 1987.

---

Marc Johnston, Appellate Staff Atty., Civ. Div., Dept. of Justice (Richard K. Willard, Acting Asst. Atty. Gen., Robert S. Greenspan, Appellate Staff Atty., Civ. Div., Dept. of Justice, Brent D. Ward, U.S. Atty., Henry A. Gill, Acting Asst. Gen. Counsel, and Edward Jiran, Atty., Dept. of Energy, Ralph H. Johnson, Pamela L. Wood, and Patrick O. Cavanaugh, Trial Attys., Torts Branch, Civ. Div., Dept. of Justice, with him on the brief), Washington D.C. for defendant-appellant.

Dale Haralson of Haralson, Kinerk & Morey, Tucson, Ariz., and Ralph E. Hunsaker of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz. (Denneen L. Peterson of Haralson, Kinerk & Morey, David M. Bell and Scott E. Boehm of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beashears, Stewart L. Udall of Beer and Toone, Phoenix, Ariz., J. MacArthur Wright of Wright & Miles, St. George, Utah, with them on the brief), for plaintiffs-appellees.

Before McKAY, SETH, and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

In this action under the Federal Tort Claims Act, *see* 28 U.S.C. §§ 1346(b), 2401(b), 2671–80, nearly 1200 named plaintiffs have sued the United States, alleging some 500 deaths and injuries as a result of radioactive fallout from open-air atomic bomb tests held in Nevada in the 1950s and 1960s. The district court selected and tried twenty-four "bellwether" claims, in order to find a common framework for the rest.[1] *See Allen v. United States,* 588 F.Supp.

---

1. The trial lasted thirteen weeks. The trial transcript runs more than 7,000 pages; the exhibit evidence more than 54,000 pages. The district court deliberated for seventeen months, then issued an opinion which occupies 225 pages of the Federal Supplement.

247, 258 (D.Utah 1984). The court entered final judgment in favor of the government on fourteen of these claims and against the government on nine, leaving one claim outstanding. *Id.* at 446–47. It then granted a Fed.R.Civ.P. 54(b) motion permitting the government to appeal those claims resolved against it. On appeal the government contends that (1) the "discretionary function" exception in 28 U.S.C. § 2680(a) precludes government liability; (2) the government did not breach any duty owed to the public; (3) the government did not cause plaintiffs' injuries; and (4) the plaintiffs' claims were barred by the two-year statute of limitations in 28 U.S.C. § 2401(b). We do not discuss the last three issues, because we agree that the discretionary function exception precludes government liability.

The district court opinion states the facts fully. *See Allen,* 588 F.Supp. at 337–38, 348–50, 358–404. The authority for federal atomic bomb tests came from the Atomic Energy Act of 1946, Pub.L. No. 585, 60 Stat. 755 ("the 1946 Act"). *See* Atomic Energy Act of 1954, 42 U.S.C. §§ 2011–2296 (present version of atomic energy statutes). Under the 1946 Act, the Atomic Energy Commission (AEC) received broad discretionary power to "conduct experiments ... in the military application of atomic energy." 1946 Act, § 6(a); *see* 42 U.S.C. § 2121(a) (same authority in present statutes).[2] The AEC was authorized to carry on such experiments "only to the extent that the express consent and direction of the President of the United States has been obtained, which consent and direction shall be obtained at least once each year." *Id.* Additionally, the AEC was "authorized and directed to make arrangements ... for ... the protection of health during research and production activities." 1946 Act, § 3(a). These arrangements were to "contain such provisions to protect health, to minimize danger from explosion and other hazards to life or property ... as [the AEC] may determine." *Id.; see* 42 U.S.C. §§ 2012(d)–(e), 2013(d),

2051(d) (similar provisions in present statutes).

In 1950 the AEC chose an area in Nevada as a testing site. The President approved this choice. Thereafter, between 1951 and 1962, eight series of open-air tests were conducted, with the President approving each series of tests. Over one hundred atomic bombs were detonated.

Each test explosion was executed according to detailed plans which the AEC officially reviewed and adopted. Separate plans for protecting the public, and for providing the public with appropriate information, were also adopted by the AEC. To actually execute the plans, however, the AEC delegated some of its authority. The AEC selected a "Test Manager" for each test series, who had some day-to-day discretion. The Test Manager could, for example, postpone a given test because of adverse weather conditions. The Test Manager in turn delegated authority to a Radiological Safety Officer (a "Radsafe Officer") who was in charge of implementing plans to avoid radiation dangers, and a Test Information Officer who was in charge of implementing plans to provide public information on the tests. Both the Radsafe Officer and the Test Information Officer also had some day-to-day discretion in performing their duties.

At trial, as a basis for governmental liability, plaintiffs singled out the alleged failure of the government, especially of the Radsafe Officers and the Test Information Officers, to fully monitor offsite fallout exposure and to fully provide needed public information on radioactive fallout. The district court focused on these two failures in finding government liability. *Allen,* 588 F.Supp. at 372–404.

The Federal Tort Claims Act (FTCA) authorizes suits for damages against the United States

"for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while act-

---

**2.** In 1974, the AEC was abolished and its functions transferred to the Nuclear Regulatory Commission and the Energy Research and De- velopment Administration. Energy Reorganization Act of 1974, Pub.L. No. 93–438, 88 Stat. 1233.

ing within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b). In such suits, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Suit is not allowed, however, for any claim

"based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty* on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*"

28 U.S.C. § 2680(a) (emphasis added). The key term, "discretionary function," is not defined. For over thirty-five years the federal courts have been attempting to define it.

Plaintiffs in the present case attempted to distinguish between the discretionary initiation of government programs, at the highest levels of administration, and the decisions involved in carrying out programs, at lower levels. Plaintiffs argued that while low-level decisions may involve some "judgment," they do not fall within the discretionary function exception of § 2680(a). *See, e.g., Indian Towing Co. v. United States,* 350 U.S. 61, 64, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955) (reference to "operational level" of activity; no immunity found for government failure to operate lighthouse). The district court agreed, basing its finding of government liability squarely on a distinction between high-level and low-level government activity. *Allen,* 588 F.Supp. at 335–40.

After the district court judgment in the present case, the Supreme Court decided *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), in which it explicitly rejected distinctions based on the administrative level at which the challenged activity occurred. In *Varig,* various plaintiffs brought an FTCA suit against the United States, claiming that the Federal Aviation Administration (FAA) had negligently implemented plane inspection and design certification programs, allowing improper flammable materials and a defective heater system to be used to construct a specific Boeing 707 and a specific DeHavilland Dove. The planes in question caught fire and burned, killing most of those on board. The Supreme Court held, however, that the United States was immune from suit. The Court found that the contested FAA actions constituted the performance of a "discretionary function," exempt under 28 U.S.C. § 2680(a) from potential FTCA liability. 467 U.S. at 819–21, 104 S.Ct. at 2767–68.

The plaintiffs in *Varig* focused on "low-level" decisions in their suit. They challenged the actual issuance by the FAA of design approval certificates for two plane types, the decision to enforce FAA standards with a particular "spot-check" system, and the actual plane inspections that were and were not carried out under that system. 467 U.S. at 799–803, 816–20, 104 S.Ct. at 2757–59, 2765–67. The Supreme Court found that each of these actions constituted a discretionary function, immune from suit under § 2680(a):

"'[T]he "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.'"

*Id.* at 811, 104 S.Ct. at 2763 (quoting *Dalehite v. United States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–68, 97 L.Ed. 1427 (1953)). The Court emphasized that it is "the nature of the conduct, rather than the status of

the actor, that governs whether the discretionary function exception applies in a given case." *Varig*, 467 U.S. at 813, 104 S.Ct. at 2764.

■ On appeal, plaintiffs contend that the AEC, in planning and conducting its monitoring and information programs, was not making the kind of policy judgments protected by § 2680(a). They point to the general statutory provisions instructing the AEC to consider public health and safety, and claim that these broad congressional directives leave no further room for discretion. We disagree.

In the case before us, as in *Varig*, the government actors had a general statutory duty to promote safety; this duty was broad and discretionary. In the case before us it was left to the AEC, as in *Varig* it was left to the Secretary of Transportation and the FAA, to decide exactly *how* to protect public safety. If anything, the obligation imposed on the FAA to protect public safety was greater and the discretion granted to the FAA by Congress was less, in the circumstances reviewed by *Varig*, than the comparable obligation imposed and discretion available to the AEC in the present case. *Compare* 49 U.S.C. § 1421 (FAA safety duty) *with* 42 U.S.C. § 2051(d) (AEC safety duty). We cannot say that what was protected by the Supreme Court in *Varig* is now subject to liability.

Plaintiffs further contend that, even if the initial discretion granted the AEC by statute was broad, test site personnel violated the AEC's own policy directives by failing to implement adequate protective measures. We cannot accept this argument either. Neither the plaintiffs nor the district court have been able to point to a single instance in which test site personnel ignored or failed to implement specific procedures mandated by the AEC for monitoring and informing the public. Indeed, the district court's conclusions appear to be based, at least in part, on perceived inadequacies in the AEC's radiological safety and information plans themselves.[3] The court relied heavily on a 1954 report to the AEC by the Committee to Study Nevada Proving Grounds which was moderately critical of the measures taken up to that point to inform and warn the public. *See Allen*, 588 F.Supp. at 386–90, 392–93. The stated objective of this report, however, was "[t]o be a basis for Commission decisions on future policy." Pl.Ex. at 4. The operational plans the district court considered deficient embody those AEC policy decisions. As such, these plans clearly fall within the discretionary function exception.[4]

Government liability cannot logically be predicated on the failure of test-site personnel to go beyond what the operational plans specifically required them to do. If, as the plaintiffs maintain, the AEC delegated "unfettered authority" to a Test Manager and his subordinates to implement public safety programs, this simply compels the conclusion that those officers exercised considerable discretion. Their actions, accordingly, also fall within the discretionary function exception.

■ It is irrelevant to the discretion issue whether the AEC or its employees were negligent in failing to adequately protect the public. *See Cisco v. United States*, 768 F.2d 788, 789 (7th Cir.1985); *General Public Utilities Corp. v. U.S.*, 745 F.2d 239, 243, 245 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1227, 84

---

3. The district court stated that its review of "the various radiation safety plans, public information plans, and related documents" disclosed the "astounding fact" that no concerted effort was made "to directly monitor and record internal contamination or dosage in off-site residents on a comprehensive person-specific basis." *Allen*, 588 F.Supp. at 373–74.

4. In the one instance which suggested that a subordinate contradicted an official direction by a superior, the district court quoted at length from a document which it characterized as a modification or redetermination of AEC policy regarding off-site exposure levels by personnel at the "NTS operational level." *Allen*, 588 F.Supp. at 385–86. But the district court was actually quoting from the official Operations Plan for the RANGER test series which had been annexed as an appendix to the Rad-Safe Group's after-series report. Def. Ex. 88 at 66, 69.

L.Ed.2d 365 (1985).[5] When the conduct at issue involves the exercise of discretion by a government agency or employee, § 2680(a) preserves governmental immunity "whether or not the discretion involved be abused." For better or worse, plaintiffs here "obtain their 'right to sue from Congress [and] necessarily must take it subject to such restrictions as have been imposed.'" *Dalehite v. United States*, 346 U.S. 15, 31, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953) (quoting *Federal Housing Administration v. Burr*, 309 U.S. 242, 251, 60 S.Ct. 488, 493, 84 L.Ed. 724 (1940)).[6]

To be sure, the circumstances in *Varig* are not identical to those now before us. Most notably, *Varig* involved the actions of a regulatory agency supervising private individuals. The Court observed in *Varig* that the discretionary actions of government regulators were at the core of what § 2680(a) was intended to protect. But *Varig* expressly reaffirmed the earlier Supreme Court decision of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), which found very broad governmental immunity outside a regulatory setting. *See Varig*, 467 U.S. at 810–14, 104 S.Ct. at 2762–64.

In *Dalehite*, private plaintiffs sued the government over deaths, injuries, and property damage resulting from a disastrous explosion of two shiploads of ammonium nitrate fertilizer. 346 U.S. at 22–23, 73 S.Ct. at 961. As with the AEC bomb-testing program before us here, Congress and the President, in response to international tensions following World War II, had decided on a crash government program—in *Dalehite*, a program to feed the populations of Korea, Japan, and Germany. *Id.* at 19–20, 73 S.Ct. at 959–60. Broad general authority was given to the War Department, and the War Department created a plan for massive fertilizer shipments. The Army's Chief of Ordnance was delegated discretionary responsibilities for carrying out the War Department plan, and he in turn appointed a "Field Director of Ammunition Plants" to administer the program. *Id.* Other lower-level plant managers and supply officers were also appointed.

As with the AEC bomb tests, the production of fertilizer in *Dalehite* involved a mix of private and public facilities and employees. *Id.* at 20–21, 73 S.Ct. at 960. As with the AEC bomb tests, all plans for manufacture, packing, and shipping of the fertilizer in *Dalehite* were officially approved. *Id.*

---

**5.** It is also irrelevant whether the alleged failure to warn was a matter of "deliberate choice," or a mere oversight. *See Allen*, 588 F.Supp. at 337–38. We agree with the treatment of this distinction in *Myslakowski v. United States*, 806 F.2d 94 (6th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987):

"The critical error in the trial court's analysis is in its conclusion that because the evidence does not show that the departmental policymakers evaluated the pros and cons of requiring that a warning be given concerning the rollover propensity of the jeep and then made a discretionary decision not to give such warnings, it therefore follows that no discretionary decision, of the kind contemplated by § 2680(a), was made....

Stated otherwise, even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made.

Indeed, it is, in part, to provide immunity against liability for the consequences of negligent failure to consider the relevant, even critical, matters in discretionary decisionmaking that the statutory exception exists. If it

were otherwise, a judgment-based policy determination made at the highest levels, to which all would concede that the statutory exception applies (the decision to sell surplus jeeps), would result in no immunity if the decision could be shown to have been made without consideration of important, relevant factors, or was a decision negligently reached. If that reasoning were sound, the discretionary function exception would be inapplicable in every case in which a negligent 'failure to consider' a relevant risk could be proved." *Id.* at 97–98. *Accord In re Consolidated United States Atmospheric Testing Litigation*, 616 F.Supp. 759, 776–77 (N.D.Cal.), *appeal docketed*, No. 85–2842 (9th Cir.1985).

**6.** Plaintiffs rely heavily upon an AEC policy report accepting responsibility for reimbursing radiation-caused losses. We cannot treat such an agency statement as waiving the "discretionary function" exclusion Congress placed in the FTCA. The existence of an administrative claims system does not constitute a waiver of sovereign immunity. *See United States v. Shearer*, 473 U.S. 52, 58 n. 4, 105 S.Ct. 3039, 3043 n. 4, 87 L.Ed.2d 38 (1985); *Feres v. United States*, 340 U.S. 135, 144–45, 71 S.Ct. 153, 158, 95 L.Ed. 152 (1950).

at 38–40, 73 S.Ct. at 969–70. The *Dalehite* plaintiffs, like the present plaintiffs, were unable to point to any instances in which government employees acted negligently in performing specific, mandatory duties. The *Dalehite* plaintiffs instead argued primarily, just as the present plaintiffs argue here, that at various points the government could have made better plans, and that the government failed to fully investigate the hazards of the dangerous material involved and to fully inform and warn the nearby populace. *Id.* at 23, 73 S.Ct. at 961.

The Supreme Court in *Dalehite* found every contested government decision, action, and omission to be the performance of a discretionary function, exempt from suit under § 2680(a): the cabinet-level decision to export the fertilizer, the lower-level failure to fully test for explosive properties, the Field Director's fertilizer production plan, the actual production of the fertilizer in accordance with the government specifi-

cations, and the specific decisions to bag the fertilizer at a certain temperature and to label the fertilizer in a certain way. *Id.* at 24, 36–42, 73 S.Ct. at 962, 968–71. The various actions and omissions of the Coast Guard, supervising the actual loading of the ships, were also exempted, as was the general failure to warn the nearby populace of potential dangers. *Id.* at 23–24, 43, 73 S.Ct. at 961–62, 971.[7]

In *Varig*, the Supreme Court approved the view of § 2680(a) expressed in *Dalehite*, strongly rejecting any suggestion that later cases had narrowed the broad immunity found there. *Varig*, 467 U.S. at 810–14, 104 S.Ct. at 2762–64. Given the Court's holding in *Dalehite*, reaffirmed in *Varig*, we must conclude that the government is immune from liability for the failure of the AEC administrators and employees to monitor radioactivity more extensively or to warn the public more fully than they did.[8]

---

7. The Court in *Dalehite* approved a series of earlier lower court interpretations of § 2680(a), which the Court stated were generally "in conformity with our holding." *Dalehite*, 346 U.S. at 36 n. 32, 73 S.Ct. at 968 n. 32. The cited cases demonstrate the Court's intent in *Dalehite* to include extremely low-level and mundane decisions and implementations of decisions within the discretionary function exception of § 2680(a). *See, e.g., Toledo v. United States,* 95 F.Supp. 838, 839, 841 (D.P.R.1951) (suit over car damage caused by tree at government facility falling on car; court holds that § 2680(a) bars recovery for failure to remove diseased experimental tree, but notes that negligent removal of tree might not be exempt); *Olson v. United States,* 93 F.Supp. 150, 152–53 (D.N.D.1950) (suit for property damage caused by questionable discretionary decision of government employees to release flood waters from dam; court holds that § 2680(a) bars recovery).

8. We have previously followed the command of the Supreme Court in *Varig. See Russell v. United States,* 763 F.2d 786, 787 (10th Cir.1985) (no government FTCA liability possible, for failure of federal mine inspectors to more fully inspect Utah coal mine). Most of the post-*Varig* decisions of the other circuits are in accord with our holding today. *See, e.g., Myslakowski v. United States,* 806 F.2d 94, 97–99 (6th Cir.1986) (no liability for Postal Service decision to sell used jeeps, without warning buyers of jeep propensity to tip over), *cert. denied,* —— U.S. ——, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987); *Ford v. American Motors Corp.,* 770 F.2d 465, 466–68 (5th Cir.1985) (same); *Smith v. Johns-Manville*

*Corp.,* 795 F.2d 301, 306–09 (3d Cir.1986) (no liability for GSA decision to sell asbestos without warning of hazards); *Merklin v. United States,* 788 F.2d 172, 174–75 (3d Cir.1986) (no liability for AEC inspectors' failure to warn uranium processing plant employees of health hazards discovered during AEC inspections); *Ostera v. United States,* 769 F.2d 716, 718 (11th Cir.1985) (no liability for FBI decision to obtain release of particular person from prison to use as informant); *Begay v. United States,* 768 F.2d 1059, 1066 (9th Cir.1985) (no liability for U.S. Public Health Service failure to warn uranium miners of radiation hazards); *Cisco v. United States,* 768 F.2d 788, 789–90 (7th Cir.1985) (no liability for EPA failure to warn residents of landfill dirt contaminated with dioxin); *Baxley v. United States,* 767 F.2d 1095, 1097–98 (4th Cir.1985) (no liability for FAA failure to regulate "ultralight" aircraft); *Shuman v. United States,* 765 F.2d 283, 291 (1st Cir.1985) (no liability for Navy failure to warn shipyard workers of asbestos hazards); *Hylin v. United States,* 755 F.2d 551, 554 (7th Cir.1985) (no liability for federal mine inspectors' failure to fully inspect clay mine); *Feyers v. United States,* 749 F.2d 1222, 1227 (6th Cir.1984) (no liability for Army's failure to inspect Chrysler's operation of government-owned railyard), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985); *General Public Utilities Corp. v. United States,* 745 F.2d 239, 247 (3d Cir.1984) (no liability for Nuclear Regulatory Commission's failure to warn of possible equipment defects at the Three Mile Island nuclear facility), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985); *Flammia v. United States,* 739 F.2d 202, 204 (5th

In the instant case, no evidence was presented of any act or omission of the AEC or its employees that clearly contravened a specific statutory or regulatory duty, or that exceeded statutory or regulatory authority. There was no evidence, for example, that the Test Information Officer failed to release information he was required to give out, or that the Radsafe Officer failed to take a specific radiation measurement that had been decided upon. Plaintiffs' entire case rests on the fact that the government *could* have made better plans. This is probably correct, but it is insufficient for FTCA liability.

Our decision here adheres to the principle enunciated by the Supreme Court of broad sovereign immunity. An inevitable consequence of that sovereign immunity is that the United States may escape legal responsibility for injuries that would be compensible if caused by a private party. There remain administrative and legislative remedies; we note the express authorization under 42 U.S.C. § 2012(i) for the government to make funds available for damages suffered by the public from nuclear incidents. Nonetheless, judicial reluctance to recognize the sometimes harsh principle of sovereign immunity explains much of the tangle of the prior FTCA cases.

The Court stated in *Varig* that the purpose of § 2680(a) was to avoid any judicial intervention that "would require the courts to 'second-guess' the political, social, and economic judgments of an agency." 467 U.S. at 814, 104 S.Ct. at 2764. The bomb-testing decisions made by the President, the AEC, and all those to whom they were authorized to delegate authority in the 1950s and 1960s, were among the most significant and controversial choices made during that period. The government deliberations prior to these decisions expressly balanced public safety against what was felt to be a national necessity, in light of national and international security. However erroneous or misguided these deliberations may seem today, it is not the place of the judicial branch to now question them.

For the above reasons, we find all challenged actions surrounding the government atomic bomb tests in the 1950s and 1960s to be immune from suit, as the performance by a federal agency of a "discretionary function," protected by § 2680(a).

We REVERSE the district court's decision with regard to those nine claims in which the government was found to have liability and REMAND for further proceedings consistent with this opinion.

McKAY, Circuit Judge, concurring:

It undoubtedly will come as a surprise to many that two hundred years after we threw out King George III, the rule that "the king can do no wrong" still prevails at the federal level in all but the most trivial of matters. After the passage of the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1982) (FTCA), many people, as well as the lower federal courts, assumed that the old governmental immunity from responsibility for negligent conduct that injures individual citizens was gone. Many endorsed what appeared to be the FTCA's policy that if the citizens at large benefited from a government program, that collective citizenry, not the isolated individual injured by the negligent conduct of the program, would bear the economic burden of that injury. This case dramatically illustrates that, as interpreted by the Supreme Court in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Air-*

Cir.1984) (no liability for INS's "specific operational decision" to permit a Cuban refugee known to be a convicted felon to enter the United States). *But see Aslakson v. United States,* 790 F.2d 688, 691–94 (8th Cir.1986) (FTCA liability possible for government agency's failure to comply with its own already established safety policy); *Henderson v. United States,* 784 F.2d 942, 943 n. 2 (9th Cir.1986) (FTCA liability possible, for government missile facility safety decision not made "at the plan-

ning stage," but "operational in nature"); *Collins v. United States,* 783 F.2d 1225, 1228–31 (5th Cir.1986) (FTCA liability possible, for failure of Mine Safety and Health Administration to close mine, when challenged decisions of subordinates did not involve "policy" decisions, or involved only explicit mandatory duties); *Alabama Electric Cooperative v. United States,* 769 F.2d 1523, 1526–29 (11th Cir.1985) (FTCA liability possible, for "operational" decisions of Army Corps of Engineers in constructing river dikes).

*lines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the FTCA (and for that matter Congress' injunction that a program be carried out safely) is largely a false promise in all but "fender benders" and perhaps some cases involving medical malpractice by government doctors.

When Congress decided to employ aboveground testing, it repeatedly evinced the general intent that the tests should be conducted so as not to jeopardize the health and safety of the population downwind.[1] However, it did not delineate the health and safety measures to be taken. No mention is made of how fallout from open-air testings should be monitored or how the public should be educated regarding the effects of fallout—the two issues litigated in this case. The responsibility for developing defined health and safety plans and for disseminating information was instead delegated to the AEC.

Based on ample evidence, the trial court found that the people who designed the downwind safety program deviated from optimum practices based on the best available scientific knowledge. On a fully supported record, the trial court found the following deviations in the plans which would clearly support liability for injury under standard tort analysis as applied by the trial court: the decision to monitor randomly rather than on a "comprehensive, person-specific basis," *Allen v. United States,* 588 F.Supp. 247, 374 (D.Utah 1984); decisions not to use thyroid or whole body counters, *id.* at 375; decisions regarding the limited extent of urine, fecal, and blood sampling, *id.* at 374; the decision not to test milk samples "in order to avoid arousing public concern," *id.* at 375; the decisions to forego internal fallout assessment from inhalation of fallout particles, *id.* at 376; decisions regarding the extent of follow-up monitoring in downwind communities, *id.* at 379; the decision to distribute film badges and pocket dosimeters to a select number of residents rather than to every resident, *id.* at 379–81, 384–85; the

decisions regarding duration of monitoring, *id.* at 381; the decisions with respect to the quantum of personnel and equipment committed to the monitoring program, *id.* at 381–82; and the decisions concerning the content and appropriate tone of the information given the public as well as the decisions to use pamphlets and films as the education media, *id.* at 385–404.

Again, on a fully supported record, the trial court found that these departures from accepted safety standards were the proximate cause of suffering and death from cancer in many of the plaintiffs. Under the then-available legal precedents, the trial court reasonably concluded that the FTCA showed Congress' intent that the Government, which benefited from the testing, should bear these particular costs. The critical analysis dealt with Congress' decision in the FTCA to exempt from liability those government acts broadly and vaguely described as "discretionary functions." *See* 28 U.S.C. § 2680(a).

At the time of the trial court's decision, the leading construction of that provision by the Supreme Court was *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Language in *Dalehite* invited some courts to focus on the bureaucratic level of the decision maker in determining whether the ensuing decision or action was clothed with immunity under the discretionary function exception. Cabinet-level actions were considered clearly of a "planning" nature and thus immune. A vehicular collision resulting from driver negligence involved "operational" action and was not immune. *See Dalehite,* 346 U.S. at 28, 37, 73 S.Ct. at 964, 969. Struggling to give meaning to the elusive terms "discretionary function," and noting particularly the subsequent decisions of the Supreme Court in *Rayonier Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), and *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), some courts thought

---

1. *See* The Atomic Energy Act of 1946, ch. 724, 60 Stat. 755 and The Atomic Energy Act of 1954, ch. 1073, 68 Stat. 921 (codified as amended at 42 U.S.C. §§ 2011–2296 (1982 & Supp. III 1985)).

For detailed discussion of the two act's safety provisions, see *Allen v. United States,* 588 F.Supp. 247, 348–50 (D.Utah 1984).

the Supreme Court intended to narrow the sweep of its *Dalehite* interpretation of that exception. *See, e.g., Relf v. United States,* 433 F.Supp. 423, 427 (D.D.C.1977), *aff'd,* 593 F.2d 1371 (D.C.Cir.1979). Following that pattern, the trial court in this case focused on the decisions made at the operational level. It concluded they were not immune.

Since the appeal was lodged in this case, the Supreme Court decided *Varig Airlines.* That opinion removed all doubt as to whether the discretionary function exception is to be construed broadly or narrowly. In *Varig* the Court explicitly denounced both the increasingly narrow construction given the exception since *Dalehite* and the interpretation of *Dalehite* that focused on the bureaucratic level of the decision maker. The Court stated, "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function applies in a given case." *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764. It breathed vitality into *Dalehite* by selectively quoting language other than the planning/operational language most often cited previously: "Where there is room for policy judgment and decision there is discretion." *Id.* at 811, 104 S.Ct. at 2763 (quoting *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968). The Court thus shifted the discretionary function inquiry back toward examining the nature and character of the governmental action to determine whether it is of the type intended to be protected from tort liability by Congress. Those decisions "grounded in social, economic, and political policy," *id.* at 814, 104 S.Ct. at 2764, are insulated from our review, regardless of who the decision maker happens to be or how negligent the decision or action may be.

The majority opinion fully deals with the Supreme Court's focus in *Varig Airlines.* It is sufficient here to note that the focus is on the nature of the planning or decision making rather than on the level at which that planning or its implementation takes place. While that may create analytical problems even in automobile accident cases where the driver is left to "plan" how to drive and carry out his mission in the most economic fashion, both the facts and language of *Varig* easily cover the facts of this case. *Varig* involved an allegedly faulty safety inspection program for aircraft. The factual parallel to the safety programs at issue here cannot be distinguished on a principled basis. *Varig Airlines* gives little help to lower courts applying the new standard to specific facts—if the FTCA waiver of immunity indeed applies to anything but trivial government failures, such as automobile accidents. Nonetheless, it removes all doubt that the discretionary function exception swallows the negligent decisions before us.

The AEC devised safety and information plans prior to every open-air detonation, tailoring the plans to the demands of each specific project. None of the trial court's documented list of failures represents an instance of deviation from, or negligent implementation of, the safety and information plans adopted.[2] Rather, the court's extensive criticisms and ultimate conclusions of negligence were directed at the substance and failures of the plans themselves.

On appeal, plaintiffs do assert that "the evidence clearly demonstrates negligent and wrongful *failure to execute* and *deviation from* ... the plans approved by the Commission." Brief for the Appellee at 22 (emphasis in original). However, the evidence does not support this allegation.

---

**2.** If the evidence had demonstrated such deviation or negligent implementation, neither *Varig Airlines* nor *Dalehite* would bar our review. Both those cases confirm that *conformity* to a discretionary plan insulates the governmental action from review. *See Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968 ("It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."); *Varig Air-*

*lines,* 467 U.S. at 820, 104 S.Ct. at 2767 (acts of FAA employees immune from review because dictated by immune policy-based program). *Deviation* from an immune plan or negligent implementation of an immune plan, however, can strip the action of the discretionary function exception, for such governmental action does not involve the type of social, economic, or political policy considerations at the core of the exception.

Not one example is given of a failure to monitor or distribute information *as prescribed in the plans*.[3] Rather, plaintiffs' challenge, mirroring the trial court's concerns, goes toward the failure of the plans to specifically prescribe greater monitoring or more diffuse and in-depth information distribution. Plaintiffs' statement that "test site personnel negligently and wrongfully failed to implement basic radiological protection measures *which were common at the time,*" *id.* at 24 (emphasis added), demonstrates the true character of their allegations. Plaintiffs concede as much by stating that the trial court "determined that the fallout monitoring *program* and information *program* which coincided with the 1951–1962 open-air testing at the Nevada test site *did not comport with the 'best available scientific knowledge.'*" *Id.* at 42–43 (emphasis added).

In arguing that the safety and information plans themselves are not immune from our review under the discretionary function exception, plaintiffs contend:

> Where Congress has placed a mandatory duty upon the government to protect public health and safety, such as it did upon the Commission, it left no room for further policy-making regarding public safety. Where there is not policy-making there is no "discretion" within the meaning of 28 U.S.C. § 2680(a) and no immunity.

*Id.* at 13. Essentially, they assert that because the two Atomic Energy Acts demonstrate a concern for public health and safety, even though no specific health and safety measures are mandated therein, the safety plans devised to address that concern involved no social, economic, or political policy making.

On the contrary, the broad safety language of the Atomic Energy Acts had to be translated into concrete plans, and that translation involved the very essence of social, economic, and political decision making—the precise policy choices protected by the discretionary function exception. *See General Pub. Util. Corp. v. United States,* 745 F.2d 239, 244 (3d Cir.1984) (means chosen by Nuclear Regulatory Commission to fulfill its broad statutory duty to review safety of nuclear facilities protected by discretionary function exception), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985). These decisions concerned choices involving the social psychology of how best to inform without alarming residents, the most cost-effective way of using public funds to monitor fallout levels, and how best to use a finite number of personnel. In short, they required the AEC "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Varig Airlines,* 467 U.S. at 820, 104 S.Ct. at 2767. While those choices deviated from the standards against which liability is measured where liability is available, Congress' determination to retain government immunity for "discretionary functions," as understood post-*Varig Airlines,* puts those choices beyond our ability to review and puts compensation for injury to individuals stemming from those choices beyond our power to order.

While we have great sympathy for the individual cancer victims who have borne alone the costs of the AEC's choices, their plight is a matter for Congress. Only Congress has the constitutional power to decide whether all costs of government activity will be borne by all the beneficiaries or will continue to be unfairly apportioned, as in this case. Until Congress amends the discretionary function exception to the FTCA or passes a specific relief bill for individual victims, we have no choice but to leave them uncompensated. I must therefore concur in the majority opinion which

---

**3.** At one point in their brief, plaintiffs state that the test manager "authorized [the radsafety] officers to go beyond the information radsafety plans." Brief for the Appellee at 57. In other words, the test manager authorized the officers to deviate from the plan. Plaintiff argues that because the officers were so authorized, their failure to deviate from the plan subjects the Government to liability. This reasoning is at direct odds with *Varig Airlines* and *Dalehite. See supra* note 2. It is just such deviation from a discretionary plan that can deprive the action of the protection of the discretionary function exception.

has carefully reviewed and applied the controlling law to the facts of this case.