724 F.Supp. 778 (1989)
Dorothy ROBERTS, et al., Plaintiffs,
v.
UNITED STATES of America, Defendant.
Louise NUNAMAKER, Plaintiff,
v.
UNITED STATES of America, Defendant.
Civ. Nos. S-1766 RDF, S-76-259 RDF.
United States District Court, D. Nevada.
October 27, 1989.
Larry C. Johns, Las Vegas, Nev., for plaintiffs.
*779 Rupert M. Mitsch, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., U.S. Atty. Wm. A. Maddux, John L. Thorndal of Thorndal, Backus, Maupin & Armstrong, Las Vegas, Nev., for defendant.

ORDER ON REMAND
ROGER D. FOLEY, Senior District Judge.
In its memorandum on remand, filed September 28, 1988, 887 F.2d 899, in this case, the Ninth Circuit wrote the following:
We remand for determination of whether the discretionary function exception of 28 U.S.C. § 2680(a) applies.
Recent cases suggest that the United States may not have consented to suit in this case under the discretionary function exception to the FTCA. See In re Consolidated United States Atmospheric Testing Litigation, 820 F.2d 982 (9th Cir.1987), cert. denied sub nom., Konizeski v. Livermore Labs, [485 U.S. 905] 108 S.Ct. 1076 [99 L.Ed.2d 235] (1988); Allen v. United States, 816 F.2d 1417 (10th Cir.1987), cert. denied, [484 U.S. 1004] 108 S.Ct. 694 [98 L.Ed.2d 647] (1988). The United States did not raise this defense in this case but if the discretionary function applies, the claims should be dismissed for lack of jurisdiction. This court must consider jurisdiction even if the parties have not challenged it. See, e.g., Sumner v. Mata, 449 U.S. 539, 547 n. 2 [101 S.Ct. 764, 769 n. 2, 66 L.Ed.2d 722] (1981); Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 152 [29 S.Ct. 42, 43, 53 L.Ed. 126] (1908).
In Allen, a suit brought by members of the public injured by radioactive fallout, the Tenth Circuit said the discretionary function exception of section 2680 covers actions surrounding the atomic bomb tests in the 1950's and 1960's, 816 F.2d at 1424, including the failure by the Atomic Energy Commission (AEC) or its employees "to fully monitor offsite fallout exposure and to fully provide needed public information on radioactive fallout," id. at 1419. The court noted that the plaintiffs and the lower court had not pointed to "a single instance in which test site personnel ignored or failed to implement specific procedures mandated by the AEC for monitoring and informing the public." Id. at 1421. Rather, as the Tenth Circuit saw it, the district court's conclusions were based on perceived inadequacies in the radiological safety and information plans themselves. Id. The court concluded that "Government liability cannot logically be predicated on the failure of test-site personnel to go beyond what the operational plans specifically required them to do." Id. The actions of those who were to implement public safety programs thus fall within the discretionary function exception. Id.

In Atmospheric Testing, a consolidated appeal of suits brought by participants in the nuclear weapons testing program, the Ninth Circuit said the discretionary function exception applies both to failures to take adequate safety precautions at the test sites and to failures to issue warnings of the hazards of radiation exposure prior to 1977. 820 F.2d at 993, 996. The allegations of negligence centered on a contention that the scientists who developed a Safety Plan "failed to appreciate or prepare for the magnitude of the hazards that would result." Id. at 994. The Appellants argued that AEC and military officials were responsible for developing safety plans, for ensuring participants were not subjected to radiation doses exceeding exposure limits established by the plan and for following safety guidelines established in the plan, such as decontamination measures and use of protective clothing and gear. Id. We noted that although the plan established exposure limits, the plan was expressly subject to the authority of the officer in charge of any particular test who could permit excess exposure because the plan specified that compliance with exposure limits was conditioned upon operational requirements. Id. at 995. We determined that "responsibility for carrying out the Safety Plan was assigned to the officials in charge of the *780 tests who had discretion to adopt and modify the Plan as necessary to achieve the objectives of the test." Id. Finally, we concluded that safety decisions incorporated in the Safety Plan "were a part of the policy decisions made in the conduct of the weapons tests" and thus within the discretionary function exception. Id.

Here, the district court found that supervisory personnel failed to comply with requirements of the AEC Manual and concluded that the failure was negligent. Because the discretionary function exception was not raised or litigated in the court below, the record is not sufficiently developed for this court to determine whether Roberts' challenge is different in any meaningful way from that in Atmospheric Testing. The district court findings in this case state that Chapter 0544 of the AEC Manual mandates the preparation of written emergency plans, including evacuation and take cover procedures, procedures for accounting for all personnel and for monitoring their exposure to radiation, procedures for notifying personnal of the need to evacuate, and procedures for training security guards in the emergency plans and procedures. The AEC Standard Operating Procedure for the Nevada Test Site, NTSO-0601, which implemented Chapter 0544, gave the Test Manager the responsibility for directing evacuations. Because no written documents were prepared by the Test Manager as required by Chapter 0544, the district court found that the Government had breached its duty. Specifically, the district court found that there was no emergency evacuation plan, no plan for accounting for personnel or for monitoring their exposure, no training or drills in evacuation procedures and no training for the security guards ordered to carry out the evacuation. The crucial distinction between this case and Atmospheric Testing appears to be that Roberts does not challenge the safety procedures authorized by the AEC but rather the failure to develop the mandated procedures. We are unable to determine from the documents in the record whether the Test Manager had the degree of discretion in deciding whether to develop these plans that the Atmospheric Testing court found in that case.
Accordingly, this case is REMANDED to permit the district court to develop the record and decide whether it had jurisdiction over Roberts' complaint.[1]

FINDINGS OF FACT
On June 14, 1984, this court entered its Findings of Fact and Conclusions of Law in the above-entitled case, which read in part as follows:
D. METEOROLOGY AND PRE-SHOT EVACUATION
60. The plaintiffs have alleged that the United States was negligent in not evacuating Area 12 Camp prior to the detonation. Specifically, plaintiffs claim the decision to not evacuate was negligent due to the Camp's proximity of approximately three and one-half miles to U8d. Plaintiffs also contend that the defendant's reliance on the weather forecast that predicted any vent cloud would move away from Area 12 Camp was negligence and in any event, that the meteorological studies upon which the weather forecasts were based were negligently done. However, the Court finds, based upon the evidence presented at trial, that plaintiffs have failed to prove by a preponderance of the evidence that the United States or its employees were negligent in (1) the manner in which meteorological studies were carried out, (2) in relying upon the weather forecasts in determining not to evacuate Area 12 Camp pre-shot, and (3) in failing to evacuate Area 12 Camp pre-shot due solely to its proximity to U8d. *781 61. Area 12 Camp was located approximately three and one-half miles north-west of U8d. The Test Manager and his Operations Officer, his Advisory Panel, and other advisers, were located at the Control Point, CP-1, approximately 18 to 19 miles south of U8d.

62. A test manager is designated for each test at the Nevada Test Site. Frank Cluff was the Test Manager for Baneberry. Cluff was educated and trained in the field of meteorology. He received a degree in meteorology in 1946 and worked for many years with the United States Weather Service. He had several years' experience directly related to nuclear fallout predictions as a member of the Fallout Prediction Unit at the Nevada Test Site. He has served as deputy test manager with the AEC Office of the Test Manager and has assisted with approximately 35 tests. He has served as Test Manager for four tests. Cluff was assisted by the Test Manager's Advisory Panel, which was comprised of individuals having expertise in the fields of meteorology, radiation and in other subjects related to safety, particularly with respect to personnel, both on-site and off-site. The Baneberry advisory panel included (1) Frank Buck, an off-site activities representative from the Environmental Protection Agency, (2) Clinton S. Maupin, M.D., a medical adviser from REECo, and (3) Philip W. Allen, a meteorologist from the Air Resources Laboratory of the National Weather Service. Mr. Allen obtained a degree in physics in 1940 and has worked as a meteorologist since 1941, As chief of the Radiation Prediction Unit and a member of the Test Manager's Advisory Panel for eleven years, Allen has been involved in approximately 200 tests. The Test Manager was also advised by a scientific adviser from LLNL (Dr. Larry Germain), and by the Test Group Director (Philip Coyle), as well as by numerous other individuals in the various disciplines as designated by the Atomic Energy Commission and various support contractors, e.g., a security guard coordinator, communications coordinator, radiological safety monitoring coordinator and operations coordinator.
63. The National Weather Service obtained weather data from many sources over a period of time prior to the shot. The primary station for obtaining data was located at Yucca Flats on the Nevada Test Site. Other permanent stations supplying data were located at Jackass Flats on the Nevada Test Site, Ely and Winnemucca, Nevada; Oakland, Santa Maria and San Diego, California; Winslow, Arizona; and Salt Lake City, Utah. Further, data was obtained from mobile reporting stations located in areas near the test site and numerous wind-recording and reporting instruments on the test site itself.
64. Weather forecasting includes (a) analysis of the data gathered, (b) preparation of forecast charts, (c) examination of the shapes of the pressure systems, (d) correction for local influences, and (e) comparison of one's forecast with those of other meteorologists in the vicinity.
65. J.R. Morrell and V. Doyle Urban were meteorologists also employed by the Air Resources Laboratory of the National Weather Service. Both individuals were located in the CP-1 Building on December 18, 1970. They prepared and presented formal weather briefings from the weather data obtained from the numerous sources available. Morrell and Urban had many years of experience in meteorology and forecasting, particularly in relationship to the nuclear testing program. The Court finds them fully qualified.
66. Two formal weather briefings were held prior to the detonation on December 18, 1970. The first was held on December 17, 1970, at approximately 2:30 P.M. The second was held on the morning of the detonation at approximately 5:15 A.M. Present at both were the Test Manager, his Advisory Panel, Scientific Adviser, Test Group Director, Operations Officer and other advisers.
67. In addition to the two formal weather briefings, current meteorological data was constantly displayed in the control *782 room by viewgraph and digital readout before the Test Manager, his Advisory Panel and staff.
68. It was predicted that on December 18, 1970, the surface winds would remain out of the north-northwest, that is, blow toward the south-southeast, at about five knots until 8:00 o'clock A.M. and then shift to blow toward the north-northeast and east at about 9:00 o'clock A.M. The upper winds were predicted to be westerly (from the west) at about ten knots at the 10,000 foot level and southwesterly (from the southwest) at five to ten knots at lower levels. Area 12 Camp was not in the path of either the predicted upper, lower or surface wind trajectories. If venting occurred, fallout was predicted to be carried at approximately two to five knots to Area 3 which was south to southeast of ground zero and to Area 51 which was located to the east, northeast. The higher level winds did not alter appreciably by detonation time; lower level winds aloft became more southerly than predicted and surface winds remained from the north and northwest as predicted.
69. From the meteorological data available, the National Weather Service personnel at CP-1 detailed possible fallout trajectories prior to shot time by converting the information into fallout patterns with probable maximum exposures. Area 12 Camp was not predicted to be in a fallout area.
70. The plaintiffs contend that the meteorological data available prior to shot time proved that the surface winds were so unpredictable that Area 12 Camp should have been evacuated pre-shot. Plaintiffs have presented no credible evidence to support their allegations. To the contrary, defendant's witnesses, Philip Allen and Frank Cluff, testified that several readings are necessary in order to make a prediction and that low wind speeds provide a confidence because any material from a venting cannot move very fast with low speeds. The Court finds their testimony as fact and expert witnesses to be credible. Further, the meteorological predictions and fallout trajectories were done in a professional and nonnegligent manner consistent with the practices at the NTS and the service as a whole.
71. Many factors are considered in deciding to evacuate an area pre-shot. These include (a) the yield of the device to be detonated, (b) the type of detonation, (c) the area in which the device is being fired, and (d) weather conditions and, particularly, wind direction and velocity.
72. The Test Manager's operation plan, which was prepared December 10, 1970, did not recommend pre-shot closing or evacuation of Area 12 Camp. This plan was subject to change by the Test Manager as contingencies arose or situations changed. The winds on the morning of December 18, 1970, were predictable enough so that in the event of venting, radioactive particles would not be transported to the Area 12 Camp. The Test Manager, upon the advice of his Advisory Panel and upon consideration of all pertinent factors, properly decided to continue with the operation plan and, thus, not evacuate Area 12 Camp. The Court finds that Frank Cluff and Philip Allen acted at all times relevant here in a professional and nonnegligent manner. Their testimony, as fact and expert witnesses, as well as all exhibits relating to their testimony, was credible.
Section E, EVACUATION AND DECONTAMINATION, reads in part as follows:
E. EVACUATION AND DECONTAMINATION
73. On December 18, 1970, Chapter 0544 of the United States Atomic Energy Commission Manual was in full force and effect, the stated objective of which was to assure that appropriate emergency plans are developed, maintained and used in AEC operations for the maximum practicable protection of AEC and AEC contractor personnel, and their property, members of the public, and public and private property, in the event of emergencies involving AEC activities.

*783 74. Chapter 0544 of the Manual established standards and set forth criteria and guides applicable to emergency plans for AEC operations to assure the maximum practicable protection of AEC and AEC contractor personnel, and their property, members of the public, and public and private property, in the event of an emergency. In so doing, written emergency plans and implementing procedures were to be prepared to provide the protective measures needed to cope with all types of emergencies and to minimize the consequences of an accident. Certain aspects were considered in the planning for dealing with emergencies, with emphasis given to each aspect based on the potential risk involved. Included among the aspects to be considered were the:
(a) Maintenance of central emergency control or command centers on-site and off-site for the directors and coordinators of emergency action;
(b) Establishment of evacuation and take cover procedures, including emergency escape routes and evacuee assembly areas, and plans for the emergency transportation of on-site personnel;
(c) Procedures provided to assure that personnel are accounted for and are monitored for radiation exposure and contamination where appropriate;
(d) Conditions by which AEC and contractor personnel would be instructed to take cover or evacuate from the facility and the site;
(e) Conduct of active training programs for AEC and AEC contractor personnel to indoctrinate on-site personnel on emergency plans and procedures and to give specific training to personnel assigned emergency action responsibilities. 75. (a) NTSO-0601, the AEC Standard Operating Procedure for the Nevada Test Site, implementing Chapter 0544 in effect in December of 1970:
(1) Stated its purpose was to define policies, responsibilities, authorities, and procedures that would provide for the safety of all persons and vital materials on the NTS or designated areas of NTS where emergencies or potential emergencies occur;
(2) Defined emergency evacuations as immediate orderly withdrawal of all personnel from one or more areas of the NTS due to emergency situations; authorized modifications of pre-established plans as authorized by appropriate authority and recognized that emergency evacuations could result from unforeseen incidents, on or off NTS, involving inadvertent release of radioactivity, act of God, declared national emergency, local emergency or other disaster;
(3) Gave the Test Manager, or his representative, the responsibility for authorizing and directing scheduled or emergency evacuations or other appropriate actions during operational periods and periods when the emergency is of a nuclear or radioactive nature;
(4) Authorized support contractors to coordinate the development of and maintenance of all plans for evacuation, re-entry and continuation of vital services during scheduled evacuations and emergency situations at NTS, obtaining the approval of the Test Manager and the Director, NTSO.
(b) Reynolds Electrical & Engineering Co., Inc., a primary support contractor, established an emergency preparedness plan which set forth the criteria established in NTSO-0601.
(c) It is not possible to plan in advance for all emergency contingencies due to the individuated characteristics of each emergency.
. . . . .
. . . . .
. . . . .
98. The failure of the Test Manager and his Advisory Panel to comply with the requirements of Chapter 0544 of the AEC Manual, and of NTSO-0601, promulgated to maximize protection of on-site personnel, constituted a breach of defendant's duty to those persons (including William Nunamaker and Harley Roberts) who might be exposed to radiation as a result of an accidental release of radiation. That duty is manifest and is consistent *784 with the duty of ordinary care owed by defendant to invitees upon defendant's nuclear Test Site. Specifically, defendant failed to comply with AEC requirements in the following particulars:
(a) On or before the detonation at 7:30 A.M. on December 18, 1970, there was no emergency evacuation plan for Area 12 including the Area 12 Camp, which plan would have required the inclusion of emergency evacuation routes, evacuation assembly areas or plans for emergency transportation of on-site personnel;
(b) There were no plans or procedures to insure that personnel in Area 12 were accounted for, monitored for radiation and promptly decontaminated;
(c) There had been no active training program nor periodic drills for on-site personnal to indoctrinate them on emergency plans and procedures;
(d) There had been no specific training program for those who would be ordered to carry out the emergency evacuation of Area 12 (the Wackenhut security guards, including Harley Roberts).
CONCLUSIONS OF LAW
9. Plaintiffs have failed to prove by a preponderance of the evidence that the United States or its employees breached their duty to adequately investigate the site of the Baneberry test area or to choose the same as the test area. Thus, defendant was not negligent in the selection of U8d as the site for the December 18, 1970, Baneberry nuclear test.
10. The foreseeability that a vent would occur following the detonation of the Baneberry device must be judged in light of the possibilities apparent at or prior to the time of detonation.
11. It was not reasonably foreseeable prior to December 18, 1970, under the then state of the geologic and containment art, that the geological medium in the area of the Baneberry emplacement hole would cause a breach of containment and a release of radiation into the atmosphere. The defendant was not negligent in investigating or selecting U8d as the Baneberry site.
12. The plaintiffs have failed to prove by a preponderance of the evidence that the United States or its employees breached their duty to professionally design and drill the Baneberry hole.
13. It was not reasonably foreseeable prior to detonation on December 18, 1970, that the surface winds would appreciably shift after detonation to move a possible vent cloud to Area 12 Camp. The defendant was not negligent in its meteorological studies or in its decision not to evacuate pre-shot, the Area 12 Camp, because of its proximity to U8d.

14. The plaintiffs have failed to prove by a preponderance of the evidence that the United States or any employees thereof breached their duty to professionally conduct meteorological studies and that the United States or any employees thereof failed to consider all factors in determining not to evacuate Area 12 Camp pre-shot.
15. The failure of the Test Manager and his Advisory Panel to comply with the requirements of Chapter 0544 of the AEC Manual and NTSO-0601 was negligence.
16. Although the evidence establishes that, to be on the safe side, the defendant always assumed that each nuclear detonation would vent into the atmosphere and planned accordingly, and although the defendant had no legal duty to evacuate personnel from Area 12 pre-shot in view of the weather reports and all of the circumstances, nonetheless once venting did in fact occur an immediate duty arose to vacate all of the approximate 900 personnel from Area 12 before they might be exposed to radiation, and this duty arose instanter and regardless of weather reports. The failure of the defendant to be prepared to evacuate Area 12 personnel to prevent them from being exposed to radiation was negligence.
17. The United States was negligent in the manner in which persons, including Harley Roberts and William Nunamaker, were evacuated from Area 12 after the *785 Baneberry underground nuclear test vented on December 18, 1970.
18. The United States was negligent in the manner in which persons, including Harley Roberts and William Nunamaker, who had been exposed to radiation in Area 12, were attempted to be decontaminated.
19. As a direct and proximate result of the negligence of the defendant, Harley Roberts and William Nunamaker and other persons were contaminated by fallout of radioactive material from the Baneberry vent cloud, and received doses of radiation to their bodies.

PERTINENT REGULATIONS OF THE ATOMIC ENERGY COMMISSION
The U.S. Atomic Energy Commission promulgated the following health and safety regulations:

U.S. ATOMIC ENERGY COMMISSION AEC MANUAL
Part: 0500 Health and Safety
Chapter 0544 PLANNING FOR EMERGENCIES IN AEC OPERATIONS (approved 4/1/69)
0544-01 POLICY
The AEC develops and maintains for its operations an appropriate emergency preparedness program to afford the maximum practicable protection of AEC and AEC contractor personnel, members of the public, and property in the event of emergencies involving AEC activities.
0544-02 OBJECTIVE
To assure that appropriate emergency plans are developed, maintained, and used in AEC operations for the maximum practicable protection of AEC and AEC contractor personnel, the public, and property in the event of emergencies involving AEC activities.
0544-03 RESPONSIBILITIES AND AUTHORITIES
031 The Director, Division of Operational Safety:

a. determines the need for, and develops, new and revised policies, standards, guides, and criteria for AEC emergency preparedness.
. . . . .
c. determines that AEC policies and standards for protection of health and safety are appropriately applied in emergency preparedness planning.
. . . . .
f. coordinates all matters related to emergency preparedness covered by this chapter and its appendix ...
. . . . .
033 Managers of Field Offices

a. assure that emergency plans are prepared and periodically tested for AEC and AEC contractor operations under their jurisdiction in accordance with the requirements of this chapter and its appendix ...
b. assure that appropriate emergency plans are put into effect in the event of an emergency involving AEC activities.
c. assure that emergency plans developed in accordance with the requirements of this chapter and its appendix ...
AEC APPENDIX 0544 PLANNING FOR EMERGENCIES IN AEC OPERATIONS (approved 5/6/70)
I. PURPOSE OF THIS APPENDIX
This appendix establishes standards and sets forth criteria and guides applicable to emergency plans for AEC operations to assure the maximum practicable protection of AEC and AEC contractor personnel, members of the public, and property in the event of an emergency.
II. DEFINITIONS (for this appendix)
. . . . .
B. Emergency Plan means a document providing the basis for actions to cope with an accident which adversely affects, or threatens, the health and safety of the general public, AEC or contractor employees, or other persons temporarily or permanently assigned to a facility. It details the objectives to be met by the implementing procedures and should assign organizational *786 and individual responsibilities to achieve such objectives.
C. Emergency Procedures means a document defining in detail the implementation actions and methods required to achieve the objectives of the emergency plan for each set of circumstances given in the plan.
. . . . .
. . . . .
III. GENERAL REQUIREMENTS
Written emergency plans and implementing procedures are to be prepared to provide the protective measures needed to cope with all types of emergencies and to minimize the consequences of an accident. All of the following aspects shall be considered in the planning for coping with emergencies. The emphasis given each of these aspects shall be based on the potential risk involved.
A. Organization

1. Delineate clear lines of authority and responsibility. Specify alternates and assign specific functions to individuals designated to implement the emergency plans and procedures.
2. Establish a formal system, with responsibility clearly designated, for the periodic review of emergency plans, for the appraisal of the overall emergency planning program, and to assure that the plans are updated and responsive to the potential risks of current operations.
. . . . .
. . . . .
. . . . .
E. Communications for Emergency Use

1. Establish reliable systems of emergency communication to disseminate information and instructions onsite and offsite.
2. Test communication systems onsite and offsite periodically.
3. Maintain central emergency control or command centers onsite and offsite for the directors and coordinators of emergency action.
F. Evacuation and Take Cover

1. Establish evacuation and take cover procedures, including emergency escape routes and evacuee assembly areas, and plans for the emergency transportation of onsite personnel.
2. Provide procedures to assure that personnel are accounted for and are monitored for radiation exposure and contamination where appropriate.
3. Specify conditions by which AEC and contractor personnel will be instructed to take cover or evacuate from the facility and the site.
. . . . .
. . . . .
. . . . .
. . . . .
J. Training

1. Conduct active training programs for AEC and AEC contractor personnel to indoctrinate onsite personnel on emergency plans and procedures and to give specific training to personnel assigned emergency action responsibilities.
. . . . .
3. Conduct periodic drills of both onsite and offsite emergency plans and implementing procedures to verify that arrangements for cooperation and assistance are realistic, and that personnel and familiar with the procedures....
(From Exhibit 5 in this record and an attachment in "DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF THE APPLICATION OF THE DISCRETIONARY FUNCTION EXCEPTION" (filed April 3, 1989, Document No. 613A).
U.S. ATOMIC ENERGY COMMISSION STANDARD OPERATING PROCEDURE NEVADA TEST SITE ORGANIZATION
(revised July 18, 1969 NTSO-0601-01)
Chapter 0601 EMERGENCY PREPAREDNESS PLANNING

*787 0601-01 Purpose

To define policies, responsibilities, authorities, and procedures that will provide for the safety of all persons and vital materials on the NTS or designated areas of NTS when emergencies or potential emergencies occur....
0601-02 Definitions

021 Scheduled Evacuation: Directed orderly withdrawal of all personnel from one or more areas of the NTS. Scheduled evacuations occur at predetermined dates and times in accordance with pre-established plans.
022 Emergency Evacuation: Immediate orderly withdrawal of all personnel from one or more areas of the NTS due to emergency situations. Pre-established plans may be modified as authorized by appropriate authority. Emergency evacuations which result from unforeseen incident(s), ... involving inadvertent release of radioactivity, ...
023 Take Cover Situation: Immediate direction to all personnel within a designated area(s) to proceed to, or remain, in designated shelters as required for protection from hazards that are temporary in nature.
0601-03 Responsibilities

. . . . .
. . . . .
0312 Local Emergencies

The Test Manager or his representative has the responsibility for authorizing and directing scheduled or emergency evacuations or other appropriate actions during operational periods and periods when the emergency is of a nuclear or radioactive nature. In other situations, the Director. NTSSO, or his representative, is responsible for taking appropriate action....
(From Exhibit 6 in this record and an attachment in "DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF THE APPLICATION OF THE DISCRETIONARY FUNCTION EXCEPTIONS" (filed April 3, 1989, Document No. 613A).

DISCUSSION

The Discretionary Function Exception
On April 18, 1977 (Document No. 274), the Government moved to dismiss this case based upon the discretionary function exception to the Tort Claims Act; plaintiffs' opposition was filed on May 18, 1977 (Document No. 289); the Government's reply was filed on June 21, 1977 (Document No. 314). On April 14, 1978 (Document No. 339), this court denied the Government's motion to dismiss.
In the defendant's post-trial brief, filed on May 8, 1981, at page 284 the Government states:

B. The Discretionary Function Exception precludes FTCA Jurisdiction and Requires Dismissal of Plaintiffs' Action

Thus, the issue of whether the discretionary function exception to the Federal Tort Claims Act deprives this court of jurisdiction has been in this case all along and the issue is before the Court of Appeals and is before this court on this limited remand.
In its Finding of Fact 98, this court found that the Test Manager and his Advisory Panel [which included his scientific Advisor, Test Group Director, Operations Officer and other advisors] failed to include in the Baneberry operation plan proposed for detonation on December 18, 1970, the written safety procedures as ordered and directed to be done by chapter 0544 of the AEC Manual. "Planning for Emergencies in AEC Operations", and the Appendix thereto and as directed in AEC Standard Operating Procedure at the Nevada Test Site, Chapter 0601, all as quoted from above.
Apart from finding the United States negligent in permitting radiation and in failing to evacuate and decontaminate (Findings of Fact 76 to and including 104), this court specifically found negligence on the part of the United States because of the failure of the Baneberry operations plan to spell out in writing the said mandated safety procedures.
*788 Had the required written safety procedures been included within the Baneberry operations plan, there would have been no need, upon the venting of Baneberry, for the Test Manager to deviate at all from the safety procedures in his plan.
Chapter 0544 and NTSO-0601 required such safety procedures to be included in the Baneberry operations plan in order to cope with all types of emergencies like the unexpected venting that occurred in Baneberry. Further, Chapter 0544 and NTSO 0601 spelled out just how unexpected emergencies were to be dealt with by the Test Manager during a nuclear test. In a word, had the required safety procedures been included in the Baneberry operations plan, the Test Manager would have had all the tools he needed; first, to protect Area 12 personnel from radiation because there would have been in place, expected to be carried out, proper evacuation procedures, which would have protected all employees in Area 12 from any exposure to radiation; and second, if perchance by some remote and unforeseeable circumstances any persons were exposed to radiation, proper and timely decontamination procedures would have been in place to prevent injury from any such unforeseeable radiation exposure.
Further, had the required pre shot training been carried out as required (see Section J of the Appendix, approved May 6, 1970), beyond question none of the 900 persons in Area 12 at that time would have been exposed to radiation from the Baneberry vent cloud. The mandated training pre shot was the responsibility of the Director of the Division of Safety and the Manager of the Test Site, both AEC officers, although, appropriately, such training was delegated to Reynolds Electrical & Engineering Company, the NTS prime contractor. See Camozzi v. Roland/Miller and Hope Consulting Group, 866 F.2d 287 (9th Cir.1989), James CAMOZZI, Plaintiff-Appellant v. ROLAND/MILLER AND HOPE CONSULTING GROUP, Joint Venture, Defendant, and United States of America, and Does 1 through 100, inclusive, Defendants-Appellees. Gary LESSNAU, Plaintiff-Appellant v. UNITED STATES OF AMERICA, Defendant-Appellee.
In Allen v. United States, 816 F.2d 1417 (10th Cir.1987), at page 1421, that court stated:
Neither the plaintiffs nor the district court have been able to point to a single instance in which test site personnel ignored or failed to implement specific procedures mandated by the AEC for monitoring and informing the public.
In footnote 8, page 1424, we find:
But see Aslakson v. United States, 790 F.2d 688, 691-94 (8th Cir.1986) (FTCA liability possible for government agency's failure to comply with its own already established safety policy); ...
In Judge McKay's concurring opinion in Allen, at page 1426, he stated:
The AEC devised safety and information plans prior to every open-air detonation, tailoring the plans to the demands of each specific project. None of the trial court's documented list of failures represents an instance of deviation from, or negligent implementation of, the safety and information plans adopted.2 Rather, the court's extensive criticisms and ultimate conclusions of negligence were directed at the substance and failures of the plans themselves.
2If the evidence had demonstrated such deviation or negligent implementation, neither Varig Airlines nor Dalehite would bar our review ... Deviation from an immune plan or negligent implementation of an immune plan, however, can strip the action of the discretionary function exception, for such governmental action does not involve the type of social, economic, or political policy considerations at the core of the exception.
Judge McKay, evidencing discouragement with the wide application by some courts of Varig, began his concurring opinion as follows, at page 1424:
It undoubtedly will come as a surprise to many that two hundred years after we threw out King George III, the rule that *789 "the king can do no wrong" still prevails at the federal level in all but the most trivial of matters. After the passage of the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (1982) (FTCA), many people, as well as the lower federal courts, assumed that the old governmental immunity from responsibility for negligent conduct that injures individual citizens was gone. Many endorsed what appeared to be the FTCA's policy that if the citizens at large benefited from a government program, that collective citizenry, not the isolated individual injured by the negligent conduct of the program, would bear the economic burden of that injury. This case dramatically illustrates that, as interpreted by the Supreme Court in United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797 [104 S.Ct. 2755, 81 L.Ed.2d 660] (1984), the FTCA (and for that matter Congress's injunction that a program be carried out safely) is largely a false promise in all but "fender benders" and perhaps some cases involving medical malpractice by government doctors.
Judge McKay concluded his concurring opinion at page 1427:
While we have great sympathy for the individual cancer victims who have borne alone the costs of the AEC's choices, their plight is a matter for Congress. Only Congress has the constitutional power to decide whether all costs of government activity will be borne by all the beneficiaries or will continue to be unfairly apportioned, as in this case. Until Congress amends the discretionary function exception to the FTCA or passes a specific relief bill for individual victims, we have no choice but to leave them uncompensated. I must therefore concur in the majority opinion which has carefully reviewed and applied the controlling law to the facts of this case.
The facts in In re: Consolidated United States Atmospheric Testing Litigation, 820 F.2d 982 (9th Cir.1987), are clearly distinguishable from the facts in this case, although there, like here, safety plans were to be developed for each test series. The safety plans were subject to deviations by the officer in charge of each test who could exceed safety limits, establish greater levels of radiation exposure to human beings, if need be, to accomplish the goals of the test. The plans specified that compliance with exposure limits were conditional upon operational requirements. Judgments would be made regarding safety in the light of the objectives of the tests. Safety decisions were a part of the policy decisions made in the conduct of the weapons tests. Accomplishing the goals of the tests was primary; radiation exposure to human beings was only of secondary importance.
In Arizona Maintenance Co. v. U.S., 864 F.2d 1497 (9th Cir.1989), at page 1500 the court, in response to Varig, interestingly said:
The Court used language which some courts, including our own, may have misinterpreted as extending the discretionary function exception beyond policy choices to negligent failures to follow known safety standards.... (emphasis added)
The court then goes on:
This language has created confusion concerning what negligent conduct by federal officials will subject the United States to liability. If taken literally, as the government appears to take it, such language implies that policy decisions and all conduct carrying out policy decisions are protected by discretionary function immunity, even if government employees are negligent in the course of implementing a policy decision. As a result, the discretionary function exception at times has threatened to swallow the FICA's general waiver of immunity. For example, in Begay v. United States, 768 F.2d 1059 (9th Cir.1985), cert. denied, 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988), we said that Varig, abrogated distinctions between government acts at the planning level as opposed to the "operational" *790 level and left all acts implementing a policy decision protected....
Last term, however, the Supreme Court clarified the scope of the discretionary function exception in Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)....
The Supreme Court's unanimous opinion in Berkovitz emphasized that the discretionary function exception protects only government actions and decisions that are based on the permissible exercise of policy judgment.... It made clear that all decisions implementing a discretionary decision are not necessarily protected, but only those where choices are grounded in "social, economic, and political policy." ... It also made it clear that government employees are to adhere to objective standards of care, and that conduct which does not adhere to such standards is actionable under the FTCA even though it may be undertaken in implementing a policy decision.... To illustrate its points, Berkovitz discussed a Supreme Court opinion from a quarter century ago that had clearly distinguished between a protected discretionary decision and garden-variety negligence at the operational level.... See, Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Indian Towing involved an accident allegedly caused by the Coast Guard's negligent failure to see that a lighthouse stayed in working order. The Court held in Indian Towing that while the initial decision to build and maintain the lighthouse was a discretionary judgment, the failure to maintain the lighthouse in good condition subjected the government to suit under the FTCA because the failure to maintain did not involve any permissible exercise of policy judgment....
The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a [lighthouse] and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order....
In Berkovitz, the Supreme Court expanded on the concept announced in Indian Towing. It separated the making of discretionary policy from its nondiscretionary implementation. The Court described a two-step process for determining whether the discretionary function exception applies in specific fact situations. First, a court must examine the nature of the challenged conduct and consider whether the government employee had any discretion to act, i.e., whether there was an element of choice.
Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion....
... If the employee has no choice as to appropriate conduct, there is no immunity.
If an action does involve some discretion, however, the inquiry does not end. The court must then determine whether exercise of that discretion is the kind that the discretionary function exception was designed to shield, that is whether it is one grounded in "social, economic, and political policy." Berkovitz, 108 S.Ct. at 1959.
. . . . .
. . . . .
Thus, under Berkovitz the key inquiry is not whether the government employee has a choice, but whether that choice is a policy judgment. Three recent Ninth Circuit cases, although decided before Berkovitz, now appear to illustrate the appropriate analysis after Berkovitz. Huber v. United States, 838 F.2d 398 (9th Cir.1988); ARA Leisure Services v. United States, 831 F.2d 193 (9th Cir. 1987); Seyler v. United States, 832 F.2d 120 (9th Cir.1987). In ARA Leisure Services, a tour bus went off the road in *791 Denali National Park. The owner of the tour bus, after being sued by those on the tour bus for injuries, sued the United States for contribution, claiming that the road had not been maintained in a safe condition. ARA Leisure Services, 831 F.2d at 194. The district court granted summary judgment for the government, holding that the claim was barred by the discretionary function exception because maintenance was a matter of choice. The district court's analysis ended there.
We reversed, holding that where the "choice" is a failure or refusal to follow safety standards, there is no immunity. We said that "[w]here the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees." Id. at 195 (quoting Aslakson v. United States, 790 F.2d 688, 693 (8th Cir.1986)). We observed that the National Parks Service decision to design and construct the road was a policy decision. However, because the failure to maintain the road in a safe condition was not a decision grounded in social, economic or political policy, the plaintiffs' case based on that failure was not barred by the discretionary function exception. Id. at 196.
Similarly, in Seyler we held that failure to maintain a road in a safe condition was not a decision protected by the discretionary function exception. In that case, plaintiff was injured while riding on a motorcycle which failed to negotiate a turn on a road maintained by the Bureau of Indian Affairs. The plaintiff alleged that the BIA negligently failed to erect speed limit signs on the road. Seyler, 832 F.2d at 122. Reversing the district court's holding that the discretionary function exception barred the plaintiff's claim, we said:
[w]e can find nothing in the record to suggest that the BIA's failure to provide signs resulted from a decision "grounded in social, economic, or political policy." (Citation omitted). Moreover, we doubt that any decision not to provide adequate signs would be "of the nature and quality that Congress intended to shield from tort liability." (Citation omitted).
Id. at 123, (quoting Varig, 467 U.S. at 813-14, 104 S.Ct. at 2764).
In Huber we held that the discretionary function exception did not bar suit against the Coast Guard for alleged negligence in connection with its attempt to assist a ship in distress. We recognized that the Coast Guard, because of its limited resources, could not help all ships in distress, and had to make a policy judgment to use its resources to help plaintiff's ship. This decision was a protected discretionary decision. Huber, 838 F.2d at 401. However, its subsequent conduct in rendering assistance was not immune from scrutiny and had to comply with the applicable standard of care.
Once that choice had been made, thereby creating reliance by [the ship's] crew, the Coast Guard became liable for its failure, if any, to conform to the applicable standard of care.... The Coast Guard's failure to assist after specifically promising assistance was not an act of the nature and quality intended to be unreviewable under the discretionary function exception....
Id.
The appropriate analysis laid down by our own Ninth Circuit cases and consistent with Berkovitz can be summarized for purposes of this case as follows. Conduct of a government agency or employee is not immune from scrutiny as a "discretionary function" simply because it involves an element of choice. It must be a choice rooted in social, economic or political policy. If it is a choice to be exercised within established objective safety standards, and the plaintiffs claim negligence in failure to follow such standards, the discretionary function exception does not apply.

*792 CONCLUSION
In In re: Consolidated United States Atmospheric Testing Litigation, supra, the purposes and objectives of the weapons test came first.
In our case, the failure to have included in the Baneberry operational plan the mandated safety procedure and the failure to have trained safety employees as explained aforesaid, was actionable negligence under the FTCA as this court has found. Such negligence was the proximate cause of the radiation and the ineffective decontamination of Roberts and Nunamaker. Had the Baneberry operational plan carried out the mandate of Chapter 0544 and NTSO 0601 upon the unexpected venting of the Baneberry shot, none of the 900 personnel in Area 12 would have been irradiated because the plan would have provided for their evacuation before the vent cloud reached Area 12. However, if by some omission there was some radiation exposure to some personnel of Area 12, the decontamination procedure that should have been included in the plan and in the training would have protected the men from injury. Our Baneberry case differs from Consolidated United States Atmospheric Testing Litigation in its very essentials. In Atmospheric Testing, at the highest levels of Government it was believed and decided that national security required human safety to be subjugated to the greater national need of the nuclear weapons test. It was thought to be expedient that men (many, many men) die for the people. The discretionary function exception to the Tort Claims Act does not apply. This court has jurisdiction.
NOTES
[1] After the mandate came down, the court ordered the matter briefed. Plaintiffs filed their opening brief on January 24, 1989. Defendant filed its answering brief on April 3, 1989. Plaintiffs filed their reply brief on April 7, 1989. The matter was argued to the court and submitted for decision on April 13, 1989.