Michael Ryan ANGLE, by Joanne
M. ANGLE, as his Next
Friend, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 2:93–CV–215.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 25, 1994.

Brian D. Sheridan, Steward & Sheridan, P.L.C., Ishpeming, MI, Michael Ryan Angle, Joanne M. Angle.

Paul M. Honigberg, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, Judd R. Spray, Assistant U.S. Atty., Michael H. Dettmer, United States Attorney, Marquette, MI, United States.

### ORDER AND JUDGMENT ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

ROBERT HOLMES BELL, District Judge.

On September 14, 1994, United States Magistrate Judge Timothy P. Greeley issued a report and recommendation recommending that Defendant's motion for summary judgment for lack of subject matter jurisdiction be granted on the ground that Defendant's conduct was protected by the discretionary-function exception to the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(a). Plaintiff filed objections to the report and recommendation on September 27, 1994.

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure this Court has made a de novo review upon the record of those portions of the magistrate's disposition to which specific written objection has been made.

■ The Court reads Plaintiff's "Objections" to state two objections to the report and recommendation. First, Plaintiff argues that Air Force Regulation 90–1 imposes the mandatory requirement that the Air Force "[p]rovid[e] livable accommodations in good condition" and that Defendant's failure to inspect for, abate, or warn of lead poisoning violated this mandatory, non-discretionary requirement. A.F.Reg. 90–1, Ch. 17–1. Several circuit court decisions have considered the effect of a general statute or regulation such as A.F.Regulation 90–1, Ch. 17–1 in the context of the discretionary-function exception. There appears to be general consensus

that general regulations, such as those parts of A.F.Regulation 90–1 upon which Plaintiff relies, do not deprive the governmental agency of discretion such that the agency is not entitled to assert the discretionary-function exception. *See Daniels v. United States,* 967 F.2d 1463, 1465 (10th Cir.1992); *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1026 (9th Cir.1989); *Allen v. United States,* 816 F.2d 1417, 1421 (10th Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988). These cases rely on the Supreme Court's statements in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), and *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988) (stating that "the discretionary-function exception will not apply when a federal statute, regulation, or policy *specifically* prescribes a course of action for an employee to follow.") (emphasis added). Unlike the specific provisions of Air Force Manual 85–3, which does not appear to mandate any particular action with regard to then-existing lead-based paint, and 15 U.S.C. § 2688, which became effective after the relevant time period involved in the instant case, A.F.Regulation 90–1 allowed Defendant ample discretion to exercise policy judgments in determining what constituted "livable accommodations in good condition," how such accommodations could best be achieved, and with what factors optimum conditions would have to be balanced. *Cf. Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959.

■ Plaintiff's other objection argues that, to the extent that Defendant's conduct was discretionary, it was not grounded in social, economic, or political policy, and therefore the exception does not apply. Plaintiff acknowledges that the report and recommendation cites the " 'impact on the public fisc' " as a policy consideration made by Defendant. Pl.'s Objs. at 12 (quoting R & R at 19). However, Plaintiff argues, "budgetary considerations alone are not enough to bring challenged activity within the discretionary-function exception." *Id.* The Court finds this statement not to be supported by law. Rather, economic considerations are one type of considerations expressly recognized by the Supreme Court as bringing a decision under the protection of the discretionary-function exception, *Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988), and economic considerations are by their very nature political considerations. The cases cited by Plaintiff in this regard do not convince the Court otherwise. For example, in *Arizona Maintenance Co. v. United States,* 864 F.2d 1497 (9th Cir.1989), the court remanded the case to the trial court for that court to determine whether there were existing objective standards cabining the defendant's discretion. If so, the discretionary-function exception would not apply. *See id.* at 1504.

Upon review of Plaintiff's objections, this Court finds that the issues raised have been fully considered and properly addressed in the magistrate's report and recommendation.

Accordingly, **IT IS HEREBY ORDERED** that:

1. The Report and Recommendation of the Magistrate is **ACCEPTED** and **ADOPTED** as the opinion of the Court.

2. Plaintiff's complaint is **DISMISSED**.

### *REPORT AND RECOMMENDATION*

GREELEY, United States Magistrate Judge.

Plaintiff Michael Ryan Angle, an infant, through his next friend, Joanne Angle, his mother, filed this negligence action seeking money damages against the United States. Plaintiff alleges that he suffered lead poisoning as a result of ingesting chips of lead-based paint from the interior of the military family housing unit at K.I. Sawyer Air Force Base, near Marquette, Michigan, in which he and his family resided. Plaintiff maintains that the defendant is guilty of negligently failing to maintain the premises in a reasonably safe condition as required by Michigan's landlord-tenant jurisprudence. Jurisdiction is asserted under the Federal Tort Claims Act (FTCA), being codified at 28 U.S.C. §§ 1346(b), 2671–2680.

The defendant has moved for dismissal for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). According to the defendant, the Court lacks jurisdiction over

the subject matter of this case by virtue of the discretionary function exception of the FTCA. 28 U.S.C. § 2680(a). This motion was referred to the undersigned for proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was held by the undersigned on July 18, 1994, and the parties have fully briefed the issues presented. The matter is now ready for decision.

## I.

### STANDARD OF REVIEW

 Defendant characterizes the motion as one for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), lack of subject matter jurisdiction. Although this is technically correct, the ordinary rules to which such motions are subject are not fully applicable here. For example, ordinarily the party claiming jurisdiction bears the burden of demonstrating that the court has jurisdiction over the subject matter. *Ohio National Life Ins. Co. v. United States*, 922 F.2d 320, 324 (6th Cir.1990). In the instant motion, once the plaintiff has plead a *prima facie* case under the FTCA, the burden shifts to the government to establish the applicability of an exception to the Federal Tort Claims Act's general waiver of immunity. *Carlyle v. United States*, 674 F.2d 554, 556 (6th Cir.1982); *Prescott v. United States*, 973 F.2d 696, 701 (9th Cir. 1992).[1] Moreover, the motion must be denied if a genuine issue of material fact exists with respect to whether the exception is applicable.

## II.

### STATEMENT OF FACTS

The facts are not in dispute. Plaintiff resided with his parents in a military family housing unit known as 149 Panther on the K.I. Sawyer Air Force Base from the time of his birth in March 1989 until January 1991. During that time period, he allegedly ingested lead-based paint chips, causing him to suffer lead poisoning.

The Department of Defense Directive No. 4165.63, effective July 20, 1989, indicates that it is the policy of the Department of Defense to "provide excellent housing facilities ... for military members, their families, and eligible civilians...." The Comptroller of the Department of Defense is required to provide procedures on financing, budgeting, and accounting for military housing. *Id.* Housing is provided to members of the military for various reasons, including "where personnel must reside on the installation for reasons of military necessity." DoD 4165.63–M 1–2.

Between 1988 and 1990, the Air Force owned over 128,000 military housing units worldwide which were constructed prior to 1978. *See* affidavit of Michael J.W. Kaminskas, attached to defendant's Motion to Dismiss. The cost of sampling an individual housing unit for the presence of lead-based paint is between $300.00 and $500.00. To sample all existing units would cost approximately $51 Million. *Id.* The estimated cost of removal of all lead-based paint from military housing units is over $900 Million. Some of the techniques available today for sampling lead-based paint were not readily available between 1988 and 1990. *Id.* Between 1988 and 1990, the Federal Budget for the Department of Defense did not provide any money for sampling or abatement programs relative to lead-based paint in military housing.[2]

The defendant's uncontroverted evidence indicates that prior to October 28, 1992, the Air Force had addressed the issue of lead-based paint. Air Force Manual 85–3, entitled "Paints and Protective Coatings" (hereinafter AFM 85–3), dated June 1981, at Section 1.5.2, forbid the prospective use of lead-based paint in "the interior of residential structures and exterior surfaces accessible to children (window sills, porches, railings, etc.)".... constructed or rehabilitated by the federal government after its effective date. According to the defendant, this provision implemented the Consumer Product Safety

---

**1.** Defendant does not claim that plaintiff's complaint fails to state a *prima facie* case under the FTCA.

**2.** Since 1990, significant efforts in the areas of sampling, abatement, and notification have been undertaken to deal with lead-based paint in military housing. *See* Kaminskas affidavit.

Commission restriction on the amount of lead in paint manufactured for non-industrial uses, which took effect on February 27, 1978.

The government's uncontroverted evidence indicates that the interior of 149 Panther was repainted in February 1988, just prior to the date on which the Angles occupied the unit, and that, in compliance with the requirements of AFM 85–3, it was repainted with non-lead-based paint. The evidence does not establish that any sampling had been done between 1988 and January 1991 establishing that there was lead-based paint in 149 Panther.

In addition to the requirements of AFM 85–3, military family housing was subject to a variety of other standards as set forth in numerous manuals and regulations. None of these other regulations specifically addressed lead-based paint. However, the Air Force acknowledges a general responsibility "at each level of command" to provide "livable accommodations in good condition" pursuant to Air Force Regulation 90–1, entitled "Family Housing Management" (hereinafter AFR 90–1), dated June 19, 1986, at Section 17–1.

## III.

### ANALYSIS

In adopting the FTCA, Congress waived the United States' sovereign immunity as to torts by declaring that "[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. §§ 1346(b); 2674.

There are various exceptions to the FTCA's broad waiver of immunity, however. In this case, the defendant maintains that the discretionary function exception bars this suit. 28 U.S.C. § 2680(a). That exception provides that the United States is immune when the action or omission which is at issue was "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

The discretionary function exception has received considerable attention from the Su-

preme Court. See e.g. United States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991); Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In Berkovitz, the Court summarized the controlling principles as follows:

The determination of whether the discretionary function exception bars a suit against the Government is guided by several established principles. This Court stated in Varig that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Id., at 813, 104 S.Ct., at 2764. In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. See Dalehite v. United States, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) (stating that the exception protects "the discretion of the executive or the administrator to act according to one's judgment of the best course"). Thus, the discretionary function exception will not apply when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect. Cf. Westfall v. Erwin, 484 U.S. 292, 296–297, 108 S.Ct. 580, 584, 98 L.Ed.2d 619 (1988) (recognizing that conduct that is not the product of independent judgment will be unaffected by threat of liability).

Moreover, assuming the challenged conduct involves an element of judgment, a

court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. the basis for the discretionary function exception was Congress' desire to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines, supra,* at 814, [104 S.Ct. at 2765] ("Where there is room for policy judgment and decision there is discretion"). In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

*Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. at 1958–59.

■ Under this scheme, the initial inquiry is whether the plaintiff's injury was the result of a discretionary function or duty or the failure to exercise or perform a discretionary function or duty. Assuming this first prong is satisfied, the Court must also determine whether the challenged conduct was of the kind that the discretionary function exception was designed to shield, that is, a decision grounded in social, economic, or political policy. If both prongs are satisfied, the government is immune from suit and the case must be dismissed.

■ While the foregoing standards are easily stated, the courts continue to struggle with their application from case to case. It is clear that the discretionary function exception does not shield all discretionary decisions, but only those which Congress intended to protect. The Court may not extend the exception beyond that which Congress intended. *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764 (the immunity extends only to "acts ... of the nature and quality that Congress intended to shield from tort liability"). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958 (quoting *Varig Airlines,* 467 U.S. at 808, 104 S.Ct. at 2761–

62). Despite numerous Supreme Court decisions, the search for some workable line of demarcation between that which Congress intended to shield and that which it intended to subject to liability continues.

■ Beginning with the more obvious principles, discretionary conduct is that which "involves an element of judgment or choice." *See e.g. Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958. Thus, conduct which is ordained by mathematically or scientifically precise standards or rules is not, by definition, discretionary and, therefore, is not within the exception. *See Gaubert,* 499 U.S. at 322, 331, 111 S.Ct. at 1273, 1278; *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958–59.

■ Further, "whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the government acting in its role as a regulator of the conduct of private individuals." *Varig Airlines,* 467 U.S. at 813–14, 104 S.Ct. at 2764. Thus, the government has not exposed itself to liability for its exercise of traditional government functions. As one writer remarked, "Of course, it is not a tort for government to govern." *Dalehite,* 346 U.S. at 57, 73 S.Ct. at 979 (Jackson, J., dissenting). However, since the exception protects "discretionary" functions, rather than "regulatory" functions, the exception does not cover all regulatory acts, but only such regulatory acts as are "discretionary" in nature. *Berkovitz,* 486 U.S. at 538–39, 108 S.Ct. at 1959–60.

■ Moreover, "it is the nature of the conduct, not the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764. Thus, the distinction between planning level and operational level functions has been discarded. *Cf. Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968 (actions of subordinates carrying out a planning level policy decision are insulated from liability) with *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274–75 (regardless of the hierarchical level, only discretionary decisions are protected).

■ At its very core, according to the high court, the discretionary function exception exists to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1273 (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2764–65). Since nearly all governmental conduct involves some element of discretion, the exception extends only to those discretionary functions which are grounded in formulating and carrying out the public purposes with which the regulatory regime is charged. *Gaubert,* 499 U.S. at 325 and n. 7, 111 S.Ct. at 1275 and n. 7.

This is not to say that a strict dichotomy exists, as it does in the law of municipalities, premised on the difference between "core governmental functions" and "proprietary" conduct. In fact, such a dichotomy has been rejected at least twice. *See Indian Towing,* 350 U.S. at 64–65, 76 S.Ct. at 124–25 (disapproving argument that FTCA precludes liability for the performance of "uniquely governmental functions"); *Rayonier, Inc. v. United States,* 352 U.S. 315, 318–19, 77 S.Ct. 374, 376–77, 1 L.Ed.2d 354 (1957) (same). Instead, the focus remains on whether the conduct was discretionary and whether it involved the exercise of policy judgment. *Berkovitz,* 486 U.S. at 539, 108 S.Ct. at 1960. This must be so, for examples are readily available of uniquely governmental conduct which does not involve policy-based discretion. *See e.g. Indian Towing,* 350 U.S. at 69, 76 S.Ct. at 126–27 (the failure to maintain a lighthouse in good working order was not grounded in public policy). Similarly, examples abound of "proprietary" conduct in which public policy informed the discretionary conduct. *See e.g. Dalehite,* 346 U.S. at 38–42, 73 S.Ct. at 969–71 (however like manufacturing, packaging and shipping fertilizer may be to private enterprise, the considerations which dictated the relevant decisions were grounded in the public policy of increasing the food supply in occupied areas during World War II); *Gaubert,* 499 U.S. at 322, 111 S.Ct. at 1273 (the day-to-day management decisions by government officials operating a faltering business, where undertaken to advance the public's interest in the solvency of the FSLIC insurance fund and to maintain the public's confidence in the savings and loan industry, are entitled to the exception).

■ On the other hand, the dichotomy between conduct which is within the traditional scope of a core governmental function and that which is not is not irrelevant to this inquiry. The statute provides that "[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. §§ 2674; 1346(b). From this statement of the law, two principles are drawn. First, the FTCA does not expose the government to civil liability for uniquely governmental activity, since private individuals do not, by definition, engage in "like circumstances." Further, the FTCA does not expose the government to liability where no parallel or analogous cause of action exists against a private individual "under like circumstances." *Dalehite,* 346 U.S. at 43–44, 73 S.Ct. at 971–72 (no analogous liability exists against private entities for uniquely governmental functions, such as firefighting, military operations, etc.). *Cf. Rayonier, Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). Thus, when the government performs a function unique to its governing role, its conduct is controlled solely by constitutional, statutory and administrative mandates and not by the added threat of private damage suits. *See Dalehite,* 346 U.S. at 59, 73 S.Ct. at 979–80 (Jackson, J., dissenting).

■ The often cited paragraph from the congressional committee report of the bill containing the discretionary function exception which is said to "explain[ ] the boundaries of the sovereign immunity waived" reveals that "[u]ppermost in the collective mind of Congress were the ordinary common-law torts" of governmental employees. *Dalehite,* 346 U.S. at 28, 73 S.Ct. at 964.[3] The negligence of a vehicle driver is the classic exam-

---

3. The committee report paragraph is quoted in full at *Dalehite,* 346 U.S. at 29–30, n. 21, 73 S.Ct. at 964–65, n. 21.

ple of a common-law tort which, although involving discretionary conduct, does not fall within the exception. The need for expedition versus the need for caution while driving may well require the exercise of discretion, but such discretion "can hardly be said to be grounded in regulatory policy." *Gaubert,* 499 U.S. at 325, n. 7, 111 S.Ct. at 1275, n. 7.

The Supreme Court has not precisely defined how far beyond the automobile exception the waiver goes. In the opinion of the undersigned, the statutory language, the legislative history, and the interpretations of same provided by the Supreme Court, require the Court to focus on whether the discretionary conduct was grounded in considerations of governmental or public policy.

 Discretionary conduct which involves the regulation of private conduct is presumptively grounded in public policy. *Varig Airlines,* 467 U.S. at 813–14, 104 S.Ct. at 2764–65. The same is not necessarily true of those governmental functions which are performed more traditionally by private enterprise or which are performed by governmental and private enterprise both. The statutory language clearly states that it is only when the government steps outside its role as regulator, or engages in activity which private entities engage in as well, that the FTCA comes into play. In such cases, the common law is to provide the standard to which the government, and private entities as well, must conform unless the exception applies. If the government commits an act for which a private person would be liable under the common law of the state, the FTCA, as interpreted by the Supreme Court, provides that the government will be liable to the same extent as the private entity, *unless* the government's tort arose from the exercise of discretion grounded in governmental considerations.

In *Lockett v. United States,* 938 F.2d 630 (6th Cir.1991), the plaintiffs were residents of an area near a site where a toxic substance was discovered. The plaintiffs brought suit against the Environment Protection Agency, claiming that the EPA was negligent in its handling of the contaminated site. Specifically, the plaintiffs maintained that the EPA was negligent in not warning residents of the risk or engaging in an immediate clean-up of the site. Relying on *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the court utilized the two-pronged test in determining whether or not the discretionary function exception applied to the circumstances presented. The court explained that the first issue it faced was whether or not the action or inaction was a matter of choice for the acting employees. This inquiry considered whether or not the EPA had discretion in deciding which course of action to take. The court then noted that assuming the EPA had discretion in determining how to approach the problem, the court must then determine whether the discretionary decision involved in taking the action or inaction was the kind of discretionary judgment rooted in a social, economic, or political policy that Congress intended to shield from liability. The facts in *Lockett* indicated that the EPA had discovered the existence of a toxic substance near the plaintiffs' residences. The plaintiffs were not immediately warned of this discovery and no immediate corrective actions were taken. After carefully examining the pertinent regulations and statutory language, the court concluded that the decision not to warn or take immediate corrective action was within the discretion of the EPA employees. The court went on to conclude that the EPA's decision not to take action was based on a judgment that it lacked sufficient evidence to take immediate action and that further study was warranted. The court found that the EPA employees had made judgment calls concerning the sufficiency of the evidence of a violation and that its action concerned "public policy" discretionary judgments intended to be shielded from liability. *Id.* at 638–39.[4]

---

**4.** Cf. *Myers v. United States,* 17 F.3d 890 (6th Cir.1994), a case in which the court considered whether survivors of miners killed in an explosion could file an FTCA claim against the Mine Safety and Health Administration. The court concluded that the discretionary function exception to the FTCA did not apply because the actions taken by the defendants were not "policy decisions." According to the court, the inspectors' actions were to be governed by objective principles of safety, not considerations of political, social, or economic policy.

In *Myslakowski v. United States,* 806 F.2d 94 (6th Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987), the Sixth Circuit concluded that the failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made. In *Myslakowski,* the Post Office sold a mail-delivery jeep to a private citizen as part of a program to dispose of surplus property. The jeep was offered for sale in a manner consistent with a department-wide policy which required, among other things, that motor vehicles be offered for sale "as-is-where-is." After being sold to a private citizen, the jeep was involved in a collision, causing it to roll over. Its occupants were either injured or killed. In their FTCA suit, plaintiffs maintained that the government was negligent in selling the jeep to the public, in failing to affix proper warnings to the jeep concerning a dangerous risk of rollover, and in designing the jeep with dangerously low rollover resistance.

The district court concluded that the decision to dispose of the jeep was a policy-based discretionary decision shielded from civil liability, but that the "manner of sale," and, specifically, the failure to warn of the rollover risk, was not, as paraphrased by the Sixth Circuit, "the result of a deliberate decision at all, but a mere omission, an act of default, attributable to department shortsightedness." As such, according to the district court, the statutory exception for such decisionmaking was inapplicable.

The Sixth Circuit disagreed:

> The critical error in the trial court's analysis is in its conclusion that because the evidence does not show that the department policymakers evaluated the pros and cons of requiring that a warning be given concerning the rollover propensity of the jeep and then made a discretionary decision not to give such warnings, it therefore follows that no discretionary decision, of the kind contemplated by § 2680(a), was made concerning the terms, conditions, and "manner" of sale of the jeep. Thus, the statutory exception to the waiver of

immunity for such decisions is inapplicable. We respectfully disagree.

> The fact that, in making the discretionary policy judgment to sell the jeeps "as-is-where-is," the government officials may not have evaluated some or all of the dangers associated with the use of jeeps as passenger vehicles and may have given no thought to the need for warnings even in view of the Cornell Report, is not to say that the considerations unaddressed are therefore outside the ambit of the discretionary function exception to the statute and a basis for establishing tort liability. Stated another way, even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made.

*Id.* at 97.

In *Myslakowski,* the Sixth Circuit concluded that the decision to sell the jeep involved "consideration and adoption of certain limiting conditions: the sale was to be 'as-is-where-is.'" *Id.* at 98. The "as-is-where-is" condition permitted the prospective purchaser to start the vehicle, but prohibited test driving and off-site mechanical inspections, and implied that the government would provide "no refurbishing or reconditioning, no express warranties, and certainly no warnings." *Id.* The Sixth Circuit concluded that, even assuming it was negligent for the government to sell the jeep in this manner without consideration of the rollover risk, the decision was entitled to immunity.

> Indeed, it is, in part, to provide immunity against liability for the consequences of negligent failure to consider the relevant, even critical, matters in discretionary decisionmaking that the statutory exception exists. If it were otherwise, a judgment-based policy determination made at the highest levels, to which all would concede that the statutory exception applies (the decision to sell surplus jeeps), would result in no immunity if the decision could be shown to have been made without consideration of important, relevant factors, as was a decision negligently reached. If that reasoning were sound, the discretionary

function exception would be inapplicable in every case in which a negligent "failure to consider" a relevant risk could be proved. *Id.* at 97–98.

*Myslakowski* is frequently cited in cases involving situations where no conscious decision or exercise of discretion is involved. *See e.g. In re Ohio River Disaster Litigation,* 862 F.2d 1237, 1247 (6th Cir.1988), *cert. denied sub nom., Walker Towing Corp. v. United States,* 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989); *United States Fidelity & Guaranty Co. v. United States,* 837 F.2d 116, 120 (3d Cir.), *cert. denied,* 487 U.S. 1235, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988); *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1028 (9th Cir.1989). In each of these examples, as in *Myslakowski,* the matter which was not allegedly considered, and upon which the plaintiff based his or her case, was an aspect subsumed within a broader subject matter which was given consideration.

■ In the instant case, the defendant emphasizes that during the period the Angles resided at 149 Panther, no federal statute, regulation, or policy required the Department of Defense or Air Force to inspect military family housing units for the presence of lead-based paint; to abate or remediate any lead-based paint discovered in such units; or to notify occupants that the units might contain lead-based paint. In fact, AFM 85–3, requiring only the prospective use of non-lead-based paint, was the only mandatory and specific rule addressing lead-based paint. All other matters concerning this issue were, according to defendant, discretionary matters. Defendant indicates that, locally, by means of a traceable chain of delegation, the K.I. Sawyer base commander was vested with broad discretion and authority concerning the effective and efficient management, use, and administration of military housing programs. His or her discretion, with regard to matters relevant herein, was limited also by the requirements of AFR 90–1 and the obligation to provide "livable accommodations in good condition" to the tenants. Obviously, that discretion was also limited by budgetary constraints.

The undersigned agrees that the government enjoyed discretion to attend to the lead-based paint hazard as it saw fit. Thus, the defendants have met the first prong of the discretionary function test. The fact that the government enjoyed discretion as to this matter does not end the inquiry. The second prong of the test requires this Court to determine whether that discretion was of the kind that Congress intended to shield. As the foregoing analysis demonstrates, the focus of the inquiry is whether the government's action or inaction with respect to existing lead-based paint in housing units was based on social, economic, or political policy.

Defendant maintains that whether or not to undertake efforts to identify or remediate the hazard, or to warn residents about it, was a decision implicating the type of policy considerations that the discretionary function exception was designed to protect. According to defendant, a substantial commitment of resources would have been required to undertake the identification and remediation efforts necessary to alleviate the toxic risks of lead-based paint in military housing units, or to warn the affected residents. In fact, defendant estimates that global identification of the scope of the lead-based paint hazard would have cost $51 Million, with abatement costing almost $1 Billion.

In the instant case, as in *Myslakowski,* the lead-based paint hazard was a "matter under consideration," as evidenced by the adoption of AFM 85–3. According to the defendant, the rule in AFM 85–3 implemented a Consumer Product Safety Commission rule restricting the use of lead in paint manufactured for residential use. The regulation addressed one facet of the lead-based paint hazard while the defendant was investigating how to deal with the existing problem. In hindsight, the defendant may have been well advised to issue a warning to all residents. However, the failure to take such action does not render the discretionary function exception inapplicable. *See Myslakowski v. United States, supra.*

The decision of how to deal with the lead-based paint problem impacted on military resources, such as property, personnel, equipment, and finances. The problem was

massive in scope given that military housing was provided all over the world. Providing housing to military personnel is necessary in some situations to national security or other military functions. *See* DoD 4165.63–M. A decision concerning whether or not to warn military housing inhabitants about the existence of lead-based paint in their homes had a far reaching impact on the public fisc. The cost of sampling was significant. The ramifications of the lead-based paint hazard implicated the very feasibility of the military housing program.

This case bears similarities to *Lockett, supra,* and *Myslakowski, supra.* A problem had been identified and the defendant was considering how best to deal with that problem. The resolution of the problem had economic policy ramifications. Furthermore, the problem had political ramifications in that it affected the military housing program and, thus, the objective of the military.

The affidavit of Michael J.W. Kaminskas establishes that the defendant proceeded to investigate and gather significant evidence regarding the hazard. In my opinion, the defendant's inaction was a judgment call on how to deal with a significant problem. The defendant made a judgment call or non-call on how to approach the problem. The decision on how to deal with the problem was grounded in economic and political policy. Furthermore, the decision implicated national defense concerns.

### IV.

#### *SUMMARY*

In summary, the undersigned concludes that the discretionary function exception is applicable in this case because the defendant's lead-based paint response was grounded in social, economic, or political policy. Therefore, it is recommended that the defendant's motion to dismiss for lack of subject matter jurisdiction (Docket # 22) be granted.

*NOTICE TO PARTIES:* Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten days of your receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b);

W.D.Mich.L.R. 13. Failure to file timely objections constitutes a waiver of any further right to appeal of those issues or claims addressed or resolved as a result of the Report and Recommendation. *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). *See also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Dated: September 14, 1994.