**Kameron X. LANCASTER, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. S 95–2488.

United States District Court, D. Maryland.

June 4, 1996.

Michael A. Pulver, Spence, Kohler, Christie & Pulver, Towson, MD, for plaintiffs.

Leland S. Van Koten, Timothy B. Walthall, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION

SMALKIN, District Judge.

Infant plaintiff Kameron X. Lancaster, by his mother and next friend, Michelle Lee, and Michelle Lee, individually, have brought this suit against the United States claiming

negligence.[1] The plaintiffs allege that Kameron Lancaster ingested lead paint chips while living with his mother, Michelle Lee, and his grandmother, Florence Lee, in an employee housing unit at the Perry Point VA Medical Center [VAMC]. The housing units are managed, maintained, operated, and controlled by the United States. (Compl. at paras. 4, 7, 18). In the complaint, the plaintiffs contend that the United States breached its duty to the plaintiffs by (1) failing to inspect the house properly for lead paint, (2) failing adequately to warn the plaintiffs of the dangerous level of lead paint in the house and of the dangerous effects of lead-poisoning, (3) failing properly to maintain the property to prevent exposure to lead paint, (4) failing to remove the lead paint in a reasonable and safe manner, and (5) failing to comply with applicable laws, rules, regulations, and ordinances. (Compl. at para. 17). The plaintiffs maintain that the defendant's negligence proximately caused their injuries. (Compl. para. 21). They seek damages for past and future medical expenses, pain and suffering, loss of earning capacity, and other unspecified damages. (Compl. at paras. 20, 25). Jurisdiction is asserted under the Federal Torts Claims Act, 28 U.S.C. 2680(a).

This case is currently before the Court on the United States' motion to dismiss Counts I and II of plaintiffs' complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). According to the government, the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a) bars these claims. The government's motion has been fully briefed, and no oral hearing is necessary.

## I

The VAMC at Perry Point is comprised of several patient-care and other functional buildings, as well as 112 residential units, which are occupied by medical center staff and their family. These housing units are located in what is known as the Village. (Pls' App. at 1, Def's App. at 73). As early as 1978, two years before Florence Lee moved into VAMC housing, the VAMC was aware of a potential lead paint problem in some of the Village houses. On April 13, 1978, the hospital director Albert M. Horton sent Hospital Memorandum No. V–1.05 to Village residents. (Pls' App. at 40–42). The Memorandum, entitled "Lead Paint Hazard," warned the residents that the old paint in the Village houses would likely contain lead paint and reproduced a HUD warning concerning the danger of lead paint poisoning. In addition to this warning, VAMC published a general warning regarding the potential lead paint hazard in a Center Memorandum 138–8, (Pls' App. at 15), which was given to all new residents and which was periodically sent to Village residents between 1980 and 1990. (Pls' App. at 4). The warning in the Center Memorandum provided:

*Notice of Possible Health Hazard*

Village Residents with small children should be aware that paint used in the quarters before approximately 1957 contained lead. Although the hospital has not used paint containing lead since 1957 and has taken continuous steps to scrape and paint housekeeping quarters with non-lead paint, it is conceivable that paint chips may contain some old lead paint. Therefore, residents should exercise care to prevent small children, who are likely to do so, from eating flakes of paint.

(Pl's App. at 15). A copy of the Center Memorandum was given to Florence Lee when she moved into the Village house. She acknowledged having read it on February 19, 1981. (Pls' App. 3). She also acknowledged having read a copy of the Memorandum on July 20, 1987, when she received new keys. (Pls' App. at 3–4).

Between 1980 and 1990, the VAMC inspected Village houses when they were vacated and conducted periodic routine inspections. Florence Lee's home was inspected every October between the years 1983 and 1990. (Pls' App. at 7). All but the 1985 inspection indicated that the interior of the house was in satisfactory condition. (Def's

---

1. Although the plaintiffs' complaint initially contained eight counts, including, *inter alia,* claims for breach of warranty and nuisance, in their opposition to defendant's motion to dismiss, the plaintiffs abandoned all of their claims except the two negligence claims. (Pls' Opp.Mem. at fn. 1) ("Plaintiff will voluntarily dismiss Counts 3 through 8").

App. at 64–71). After the 1985 inspection, the interior of Ms. Lee's home was repainted by Village maintenance staff. (Pls' App. at 7). Non-lead-based paint was used. (Def's App. at 1–4).

In October of 1990, Denise O'Donnell, a VAMC nurse living with her family in Village housing, found her two year old with a paint chip in his mouth. (Pls' App. at 43). Chips of paint from Denise O'Donnell's house were tested, and the analysis showed that the chips contained lead. (Pls' App. at 44). In response, VAMC management began looking at "the best means of determining the extent of lead-based paint in other houses, and the best means of dealing with the presence of lead-based paint in houses in which it was present." (Pls' App. 91). Because lead paint poses the greatest hazard to children, VAMC management, in an effort to evaluate the scope of the lead problem, initially decided to determine (1) the number of children living in houses with chipping paint and (2) the extent to which the paint in those houses was lead-based. (Pls' App. at 3). To accomplish this goal, VAMC management sent out a memorandum and a survey in November of 1990. The memorandum (1) informed Village residents that paint samples taken from one of the Village houses indicated the existence of lead, (2) advised residents to discontinue home improvements, and (3) quoted the warning contained in Memorandum 138–8 regarding the potential hazard of lead paint. The survey (1) asked residents to notify them if they had paint that was peeling or chipping in the house, and (2) directed residents to notify them of the age of all persons living in the house. (Pls' App. at 113–115). Florence Lee returned her survey in December, 1990. In the survey, she indicated that she had a one year old child in the house and that she had some chipping and peeling paint "on the stairway as you go up stairs." (Pls' App. at 116). Based on Florence Lee's response, paint samples were taken from her home. The results, which came back on March 26,

1991, showed that the chips contained lead. (Pls' App. 82–83, and 117).

After the surveys were evaluated, VAMC management and Leslie Scott, an industrial hygienist employed by VAMC, set about to determine the best method for addressing the lead paint problem in the Village houses. According to Ms. Scott's declaration, the only method for assuring that lead paint in the houses would never pose a risk again was to remove all the paint, and then test the house to assure that removal was complete. The total estimated cost of removal was $6–7 million dollars. (Pls' App. at 4). According to Ms. Scott, the lead paint problem in the Village could also be dealt with by using an encapsulant to encapsulate the lead paint. The estimated cost of encapsulation was $1–2 million. (Pls' App. at 94). Ultimately, VAMC decided to encapsulate the lead paint in a number of Village houses. VAMC management also decided that families with children would only be allowed to live in houses that had been encapsulated. (Pls' App. at 94). Encapsulation in the first houses was completed in early 1992. On May 5, 1992, the VAMC learned that Kameron Lancaster had an elevated blood lead level. On May, 13, 1992, Florence Lee and her family, including Kameron Lancaster, were moved into a house in which the paint had been encapsulated. (Pls' App. at 94–95).

## II.

The government has moved to dismiss this suit under 12(b)(1) for lack of subject matter jurisdiction, on the ground that the VAMC's decisions concerning the lead paint problem in the Village houses fall within the discretionary function exception of the FTCA.[2] The jurisdictional statute implementing the FTCA, 28 U.S.C. 1346(b), provides a limited waiver of sovereign immunity in suits against the United States for damages due to

> personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting

---

2. Because this motion is directed to the Court's jurisdiction, it is properly styled a motion to dismiss. *Williams v. United States*, 50 F.3d 299, 305 (4th Cir.1995). In ruling on this motion, however, the Court may consider exhibits outside the pleadings. *Id.* Finally, the plaintiff bears

the burden of persuasion because when subject matter jurisdiction is challenged " 'the party who sues the United States bears the burden of pointing to ... an unequivocal waiver of immunity.' " *Id.*

within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The Act also contains several exceptions to this waiver of sovereign immunity. At issue here is the discretionary function exception, which provides that the United States is not liable for

any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680. The discretionary function exception to the FTCA "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). The exception was created to "insulate[ ] the United States from liability arising from its agents' and employees' performance of duties involving discretionary decisions." *Williams v. United States*, 50 F.3d 299, 308 (4th Cir.1995).

In two recent cases, the Supreme Court has articulated a two-part test to guide Courts in determining when the government's conduct falls within the scope of the discretionary function exception. *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, this Court must determine whether the governmental action complained of in this suit was discretionary in nature, *i.e.* whether the action involved an element of choice or judgment. *Gaubert*, 499 U.S. at 322, 111 S.Ct. at

1273; *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958–59. "This inquiry boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action. If such a mandatory federal statute, regulation, or policy applies, then the conduct involves no legitimate element of judgment or choice and the function in question cannot be said to be discretionary." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir.1993); *see also Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958–59. Second, if the governmental conduct involves an element of judgment or choice, this Court must determine whether the judgment or choice is "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. at 1959; *Gaubert*, 499 U.S. at 323, 111 S.Ct. at 1273–74. This requirement is mandated by the purpose of the exception, which is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines* 467 U.S. 797, 814, 104 S.Ct. at 2764–65, 81 L.Ed.2d 660 (1984).

Turning to the first part of the Supreme Court test, it is clear that there were no federal statutes, regulations, or policies mandating a precise course of action to be taken in dealing with the lead paint problem.[3] In fact, during the period at issue in this case, "the only mandatory national policy concerning lead-based paint was a requirement that there be no further use of such paint." (Def's Mem. at 4; Def's App. at 74). The plaintiffs do not dispute this.

The plaintiffs, however, assert that the VAMC had a "specific policy regarding lead paint and the Center's duty to inform residents of its hazards" that VAMC management did not adequately follow. (Pls' Opp. Mem. at 8). Specifically, plaintiffs point to the Hospital Memorandum V–1.05 that

---

3. In her declaration, Leslie Scott stated:
I am aware of no requirement applicable to the Perry Point VAMC, during the time that Kameron Lancaster or his family resided at 1160 4th Street, that would have required the inspection of the houses in the Village for the presence of lead-based paint, that would have

required the removal or other abatement of any lead-based paint that might have been present, or that would have required warning the residents of the presence of lead-based paint.
(Pls' App. at 95).

was sent by the hospital director to Village residents on April 13, 1978. The Memorandum provided:

It is the policy of this hospital to inform residents of housekeeping quarters of the hazard of lead paint. When a resident accepts occupancy he/she is responsible for all interior painting. *Residents should exercise care to prevent small children from ingesting flakes of paint.*

(Hosp.Mem. No. V–1.05, Pls' App. at 40). The Memorandum also reproduced a warning put out by HUD concerning the danger of lead paint. The HUD warning provided specific information regarding the source of lead poisoning, the best way to prevent lead poisoning, and the hazards of lead poisoning. *Id.* at 42.

According to the plaintiffs, this Hospital Memorandum "imposed upon the Defendant a clear mandatory obligation to inform the Village residents of the hazards posed by exposure to lead paint which existed in their homes." (Pl's Opp.Mem. at 19). The plaintiffs assert that the VAMC failed to comply with the hospital's policy directive, because the warning that VAMC issued in the Center Memorandum and the November, 1990, memorandum did not "provide the Village residents with any information as to the potential hazards of exposure to lead-based paint." (Pls' Opp.Mem. at 22). The plaintiffs assert that the first prong of the discretionary function exception test, therefore, has not been met. The Court disagrees.

■ Under *Berkovitz,* an agency policy strips government employees of discretion only when it "specifically prescribes a course of conduct to follow." 486 U.S. at 536, 108 S.Ct. at 1958–59. In other words, to remove discretion, the policy must constitute a "specific mandatory directive." *Id.* at 799, 104 S.Ct. at 2757. Assuming for the purposes of this motion that the Hospital Memorandum did establish a policy requiring VAMC management to warn residents of the lead paint

hazard, the policy clearly was a general one that left it to the discretion of VAMC officials how to carry it out. Consequently, the first prong of the discretionary function exception test is met. *See Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958–59; *see also United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) et al,* 467 U.S. 797, 820, 104 S.Ct. 2755, 2767–68, 81 L.Ed.2d 660 (holding that the acts of FAA employees in executing the FAA's spot checking program were discretionary because the employees exercised discretion in deciding how to carry out the spot checking activity); *Williams,* 50 F.3d at 310; *Baum,* 986 F.2d at 721–722; *Allen v. United States,* 816 F.2d 1417 (10th Cir.1987); *Roop v. United States Park Service,* 882 F.Supp. 567, 568 (S.D.W.Va.1995); *Estate of Bernaldes v. United States,* 877 F.Supp. 301, 305–306 (W.D.Va.1995).

■ Turning the second part of the Supreme Court test, the plaintiffs contend that VAMC's "decision not to warn residents of [the] known serious health threat [posed by lead paint] to children was not grounded in any legitimate social, economic, or political policy." (Pl's Opp.Mem. at 22) [4] Again, this Court disagrees.

■ First, in this case, the VAMC's decisions regarding the lead paint problem in the Village houses, including its decision regarding the type of warning to issue to residents, were discretionary decisions. "When established government policy … allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274. The government's actions in this case, therefore, are presumed to be grounded in policy.

Second, the undisputed evidence demonstrates that VAMC's actions regarding the lead paint problem in the Village houses were based on economic and policy considerations.[5] The lead paint problem in the Vil-

---

4. The plaintiffs do not, in their opposition motion, challenge the policy nature of VAMC's decisions regarding lead-abatement.

5. As Williams C. Atkins, the Chief Engineer of the Engineering Service at the Department of

Veterans Affairs Medical Center at Perry Point stated in his affidavit:

In deciding how to address the presence of lead-based paint in houses in the Village, it was necessary to balance a number of policy matters, including, but not limited to, the fol-

lage houses was a problem that could have cost the VAMC anywhere between $1 to $6 million to remedy. (Pls' App. at 93–94). As such, it was a problem with major budgetary and operational implications and "was a policy issue on which management of both the Perry Point VAMC and higher levels, had substantial ongoing involvement, and in which the important final decisions were made by those management officials." (Pls' App. at 91).

Providing notice to residents regarding the hazards of lead paint was just one aspect of the overall plan that VAMC developed to deal with the lead paint problem in the Village. VAMC's decision regarding the type of warning to issue involved numerous policy considerations "including the scope of the testing needed to determine the necessity and content of a warning, the scope of the warning given, the means by which the warning was to be conveyed to the occupants, and the lengths to which the government is required to go in order to ensure that the warning is conveyed to all the persons living in the house." (Defs' Rep.Mem. at 11).[6]

Finally, in determining the type of warning to issue in the November, 1990, memorandum, VAMC's management clearly consid-

ered some of these policy issues. Ms. Scott testified that she wrote the original draft of the November, 1990, memorandum, and then sent it to her superiors in VAMC management. (Pls' App. at 64). Ms. Scott testified that her superiors edited her draft to omit the "stronger reference to the health effects of exposure to lead paint." (Pls' App. at 64). When asked why she thought her original draft had been edited, Ms Scott, who was "ticked off" by the edits, (Pls' App. at 70) stated: "I got the impression they didn't want to scare anybody." (Pls' App. at 72). She then testified that she "believe[d] that was their judgment call; not ... [hers]."

It is clear from such evidence that the decision by VAMC management to issue a notice that did not reveal the specific hazards associated with lead paint was a policy decision, and as such, is exactly the type of decision that the discretionary function exception is intended to immunize from judicial second-guessing.[7] *See Angle v. United States*, 931 F.Supp. 1386 (W.D.Mich.1994); *see also Williams v. United States*, 50 F.3d 299, 310 (4th Cir.1995); *In re Consolidated United States Atmospheric Testing*, 820 F.2d 982, 997; *Allen*, 816 F.2d 1417; *Roop v. U.S. Park Service*, 882 F.Supp. 567 (S.D.W.Va. 1995).[8]

lowing: (a) the limited availability of funds and manpower to perform removal or other abatement of lead-based paint in the housing units; (b) the need to continue providing housing for employees while abatement activities were taking place; (c) the continuing controversy about the suitability and effectiveness of various potential means of abatement; and (d) the extent of any actual danger to residents of the employee housing arising from the presence of lead-based paint in the housing unit.
(Def's App. at 75 para. 13).
In her declaration, Leslie Scott stated:
Deciding upon the best means of addressing the existence of lead-based paint in existing houses is a complicated process, and requires balancing various policy considerations, including the extent of any hazards posed by the presence of lead based paint in a particular house, the degree to which various methods of abatement will reduce the risks associated with the presence of lead-based paint, and the immediate and long-range costs of the various potential abatement methods.
(Pls' App. at 93)

**6.** As the Court of Appeals for the Ninth Circuit stated in *In re Consolidated United States Atmospheric Testing*, 820 F.2d 982, 997 (9th Cir.1987):

Formulating and issuing warnings requires the government 'to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding.' The conclusion is inescapable that every aspect of a warning program is a matter that falls within the discretionary function exception as defined in ... *Varig*."
(*Id.* at 998 (quoting *Varig*, 467 U.S. at 820, 104 S.Ct. at 2767–68).

**7.** The fact that VAMC's decision not to issue a more comprehensive warning may have been negligent is irrelevant because the discretionary function exception "bars any claim ... based upon the exercise ... a discretionary function or duty, *whether or not the discretion involved be abused*," 28 U.S.C. § 2680. *Allen*, 816 F.2d 1417.

**8.** Plaintiffs' reliance on *Andrulonis v. United States*, 952 F.2d 652 (2d. Cir.1991), *Sutton v. Earles*, 26 F.3d 903 (9th Cir.1994), and *Redland Soccer Club v. Dept. of the Army*, 835 F.Supp. 803 (M.D.Pa.1993) is misplaced. In those cases, the Courts all found that the government's conduct was not covered by the discretionary exception

### III.

Because the VAMC's decisions regarding lead abatement and the type of warning to issue to Village residents were discretionary decisions grounded in public policy, the discretionary function exception bars Counts I and II. Accordingly Counts I and II will be dismissed for lack of subject matter jurisdiction under 12(b)(1). Counts III through VIII will also be dismissed, at the plaintiffs' request. There being no claims remaining, a separate order will be entered, dismissing the case.

function because the conduct was not grounded in social, economic, or political policy. The undisputed facts in this case demonstrate not only that the government's conduct was susceptible to policy analysis but also demonstrate that the decisions themselves were based on economic and policy considerations.